**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**


IN RE: CRIMSON EXPLORATION INC. )   Civil Action No 8541-VCP
STOCKHOLDER LITIGATION    )


**MEMORANDUM OPINION**

Submitted: February 25, 2014
Decided: October 24, 2014

Carmella P. Keener, Esq., ROSENTHAL, MONHAIT & GODDESS, P.A., Wilmington, Delaware; Seth D. Rigrodsky, Esq., Brian D. Long, Esq., Gina M. Serra, Esq., RIGRODSKY & LONG, P.A., Wilmington, Delaware; Kent A. Bronson, Esq., Andrei V. Rado, Esq., Gloria Kui Melwani, Esq., Melissa Ryan Clark, Esq., MILBERG LLP, New York, New York; James S. Notis, Esq., Kira German, Esq., GARDY & NOTIS, LLP, New York, New York; *Attorneys for Plaintiffs*.

Srinivas M. Raju, Esq., Robert L. Burns, Esq., RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Michael C. Holmes, Esq., Elizabeth C. Brandon, Esq., VINSON & ELKINS LLP, Dallas, Texas.; *Attorneys for Defendants Crimson Exploration Inc., Thomas H. Atkins, Lee B. Backsen, B. James Ford, E. Joseph Grady, Anthony C. Isaac, Allan D. Keel, Lon McCain, Jay S. Mengle, Adam C. Pierce, John A. Thomas, Cassidy J. Traub, Ni Zhaoxing, Oaktree Capital Management, L.P., OCM GW Holdings, LLC, and OCM Crimson Holdings, LLC.*

**PARSONS, Vice Chancellor.**

The plaintiffs in this consolidated class action challenge the now-completed stock-for-stock merger of Crimson Exploration, Inc., and Contango Oil & Gas Co. (the "Merger"). The plaintiffs allege that the directors of Crimson breached their fiduciary duties in approving the Merger. Their claims challenge the Merger on the familiar grounds of inadequate process, inadequate price, and inadequate disclosure. The complaint also alleges that a group of affiliated defendants, including Oaktree Capital Management, L.P., constituted controlling stockholders of Crimson and breached their fiduciary duties by selling the company below market value for self-serving reasons. As such, the plaintiffs ask the Court to review the challenged transaction under the entire fairness standard. Finally, the plaintiffs accuse Contango, and its affiliate, Contango Acquisition, Inc., of aiding and abetting the foregoing breaches of fiduciary duties.

For the reasons that follow, the Court concludes that the complaint must be dismissed under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Even if the plaintiffs properly allege that Oaktree, alone or with others, occupies the position of a controller that owes fiduciary duties to the other stockholders, the well-pled allegations are insufficient to implicate entire fairness. As to the director defendants, the plaintiffs failed to allege sufficient facts to support a reasonable inference that a majority of the Board was not disinterested or lacked independence. Thus, no claims against the directors support use of the entire fairness standard. Reviewing the allegations of wrongdoing under the business judgment rule, the Court finds them insufficient to state a claim. The aiding and abetting claims must be

dismissed as well largely because, apart from the inadequately pled breaches of fiduciary duty in Counts I and II, nothing remains for Contango or its affiliates to have aided or abetted.

Lastly, the Court denies a pending motion to intervene and finds that the proposed intervenor has not proffered any additional information so material that it would be unjust to dismiss this complaint with prejudice.

## I.   BACKGROUND[1]

### A.   The Parties

Defendant Contango Oil & Gas Co. ("Contango"), a Delaware corporation headquartered in Houston, Texas, is an independent natural gas and oil company that focuses primarily on properties in the Gulf of Mexico. Contango is the acquiring company in the Merger.

Crimson Exploration, Inc. ("Crimson" or the "Company") is a Delaware corporation headquartered in Houston, Texas, that operates as an independent oil and gas company. It focuses primarily on the Gulf Coast, Texas, and Colorado regions. Crimson's board consists of seven individuals, each of whom is a named defendant in this action. Crimson became a subsidiary of Contango following the Merger.

Oaktree Capital Management, L.P. ("Oaktree Capital") is an investment management firm. OCM Crimson Holdings LLC ("OCM Crimson") is a Delaware

---

[1]   Unless otherwise noted, the facts recited herein are drawn from the well-pled allegations of the Consolidated Amended Class Action Complaint (the "Complaint"), together with its attached exhibits, and are presumed true for the purposes of Defendants' motions to dismiss.

limited liability company ("LLC") and an Oaktree Capital affiliate. OCM GW Holdings, LLC ("OCM Holdings") is also a Delaware LLC. OCM Holdings is the holding company for Oaktree Capital, OCM Crimson, and other unspecified Oaktree affiliates (collectively, the "Oaktree Entities").[2] Oaktree holds roughly 15.5 million shares of Crimson common stock, which represents about 33.7% of its outstanding shares. An Oaktree affiliate also owns a significant, though unspecified, portion of Crimson's $175 million Second Lien Credit Agreement ("Second Lien"). Plaintiffs allege that Oaktree is Crimson's controlling stockholder.

Allan D. Keel is Crimson's President and CEO. He is also a member of the board. Keel owned slightly more than one million shares of Crimson common stock. He signed a support agreement to vote his shares in favor of the Merger. Following the Merger, Keel became the President and CEO of the surviving corporation and remained a director.

B. James Ford has been a director of Crimson since February 28, 2005. He is the Co-Portfolio Manager and Managing Director of Oaktree Capital Group LLC ("Oaktree Group"), Oaktree Capital's successor. He owns no shares of Crimson stock, but does own slightly more than 1.4 million shares, or slightly less than 1%, of Oaktree Group stock valued at $77 million. As anticipated, Ford has served as a director on the board of the combined company following the Merger.

---

[2]     Unless it is necessary to differentiate the various entities for reasons of clarity, this Memorandum Opinion will refer to the Oaktree Entities generally as "Oaktree."

3

Cassidy J. Traub became a Crimson director on December 7, 2009, and served on the board until the Merger closed. He also is a Vice President at Oaktree Management's Principal Group and has worked for Oaktree since 2005. He owned no Crimson stock.

Adam C. Pierce was a member of the Crimson board from January 24, 2008, until the Merger closed. He is a Senior Vice President of Oaktree, but he personally owned no Crimson stock.

Lon McCain has been a Crimson director since June 1, 2005. He has served on the board of directors of the surviving company since the Merger was effectuated.

Ni Zhaoxing served on the Crimson board as a director from December 22, 2010, until the Merger closed. He is the Chairman and CEO of America Capital Energy Corporation (ACEC). ACEC owned over 6.6 million shares of Crimson common stock, roughly 14.9% of all shares outstanding. ACEC is wholly owned by Shanghai Zhong Rong Property Group, Ltd. ("SZRPG"). Ni is the founder, CEO, and controlling stockholder of SZRPG. Plaintiffs allege that Ni, in effect, controlled ACEC's shares of Crimson. In addition, ACEC was a permitted investor under Crimson's Second Lien.

The seventh director of Crimson, Lee B. Backsen, assumed that post on June 1, 2005, and held it until the Merger closed.[3]

---

[3] The seven individual defendants—Keel, Ford, Traub, Pierce, McCain, Ni, and Backsen—comprised the Crimson Board of Directors immediately before the Merger (the "Board" or the "Director Defendants"). Of the Director Defendants, three worked for Oaktree while serving on the Board (the "Oaktree Directors"): Ford, Traub, and Pierce. Of the Director Defendants, three remained on the board of the surviving company after the Merger (the "Continuing Directors"): Keel, Ford, and McCain.

Defendant Contango Acquisition, Inc. (the "Merger Sub"), along with Contango, is accused of aiding and abetting. "Defendants," therefore, consist of the Merger Sub, Contango, the Director Defendants, the Oaktree Entities, and Crimson.

The lead plaintiffs John Knapp, Theodore Schumm, and James P. Hoffmann ("Plaintiffs") initiated this consolidated class action. Collectively, they held at all relevant times over 228,000 shares of Crimson common stock. Plaintiffs filed the operative Complaint on September 13, 2013.

### B. Significant Non-Parties

The Complaint highlights the roles of certain members of Crimson's management team and emphasizes the degree of continuity between those executives and managers before and after the Merger. For example, E. Joseph Grady, Crimson's Senior Vice President and CFO, will become the Senior Vice President and CFO of Contango. As of the Merger date, Grady held slightly more than one-half million shares of Crimson. Along with Keel, Grady participated extensively in the Merger negotiations.

Several other members of the Crimson management team also continued to serve as part of Contango's management. Thomas H. Atkins, Crimson's Senior Vice President of Exploration, held about one-quarter million shares of Crimson and became Senior Vice President of Exploration of the combined company. A. Carl Isaac, Crimson's Senior Vice President of Operations, held nearly one-fifth of a million shares of Crimson, and stayed on as Vice President of Operations. Jay S. Mengle, Crimson's Senior Vice President of Engineering, held more than one-third of a million shares of Crimson stock and has served as the Senior Vice President of Engineering of the combined company.

5

Finally, John A. Thomas, General Counsel and Corporate Secretary of Crimson before the Merger, owned 37,000 shares of Crimson stock.

Each of these executives entered into support agreements to vote their shares in favor of the Merger.

## C.      Facts

### 1.      Crimson Exploration: Its history, operations, and balance sheet

Crimson traces its history back to 1987. By May 2001, the Company was known as GulfWest. In late 2004 and early 2005, Keel saw an opportunity in the then-struggling and cash-strapped GulfWest. Seeking investors to provide the capital needed to get the Company back on track, Keel contacted Oaktree. Though Keel initially intended to take GulfWest private, Oaktree decided to leave the Company public and invested $40 million in February 2005. In connection with that recapitalization, Keel received a substantial portion of the Company's equity pursuant to an agreement he had with Oaktree, and he joined GulfWest as CEO. Around the same time, Grady became the CFO. On June 29, 2005, GulfWest merged with and into Crimson Exploration, Inc., thus becoming a Delaware corporation and acquiring a new moniker.

Initially, natural gas dominated Crimson's production profile. By 2012, however, natural gas liquids and crude oil each comprised roughly half of its production profile. Without delving into the same level of detail as the Complaint in describing Crimson's energy assets, I note two specific oil leaseholds. The first one, the Woodbine oil plays in Southeast Texas, allegedly constitute important, long-term, oil-producing properties that will generate above-average returns. Crimson acquired the Woodbine leaseholds in 2011

6

and reported successful drilling there in 2012. The second leasehold is the Buda formation in South Texas. It is a naturally fractured oil formation that also is said to be promising due to the formation's ability to produce oil more quickly and at a lower cost than extraction via fracking.

At the time of the Merger, Crimson had two lines of credit. One was a senior secured revolving credit agreement ("Senior Credit Agreement"), with Wells Fargo as agent, that matured on May 31, 2015. The borrowing base, which was dependent on proved crude oil and natural gas reserves, was $100 million. As of year-end 2012, Crimson had $30.8 million available to it under the Senior Credit Agreement. Crimson had obtained the other credit line, the Second Lien, on or around December 27, 2010, with Barclays Bank Plc as the agent. The Second Lien was a term loan with an aggregate principal of $175 million that matured on December 27, 2015. As of year-end 2012, the entire $175 million principal amount remained outstanding. An affiliate of Oaktree served as one of the Second Lien lenders. The Second Lien charged a variable interest rate based on the higher of: (a) 4%; (b) the prime rate; (c) the Federal Funds Effective Rate plus 0.5%; or (d) the one-month LIBOR rate plus 1%. Both the Senior Credit Agreement and the Second Lien were secured by liens on substantially all of Crimson's assets.

### 2. Oaktree and Keel; Oaktree and Crimson

A major premise of the Complaint is that Oaktree—alone, in conjunction with its affiliates, or as part of a larger group—controlled Crimson. I pause, therefore, to note the allegations relevant to that assertion. First, the Complaint alleges a longstanding

relationship between Keel and Oaktree dating back approximately ten years. The Director Defendants are alleged to have been handpicked by Keel and Oaktree. There are no allegations, however, that Keel ever worked directly for Oaktree or any Oaktree affiliate.

Oaktree is alleged to have exerted control over both Crimson's Board and its management. In this regard, the Complaint alleges that: (1) Oaktree owned 33.7% of Crimson's common stock; (2) Keel and Oaktree had a longstanding relationship; (3) Oaktree handpicked Grady as CFO; (4) the Oaktree Directors comprised three of the seven Board members; (5) the remaining directors were nominated to the Board after Oaktree invested in Crimson and, thus, either were approved or handpicked by Oaktree or an Oaktree employee, such as director Ford; and (6) Crimson's executive officers— namely, Keel, Grady, Mengle, Isaac, Thomas, and Atkins—joined the Company after Oaktree made its investment, and all of them executed support agreements in favor of the Merger.

### 3.    Events leading to the proposed merger

The series of events that led to the Crimson-Contango Merger appear somewhat different depending on whether one reads the Complaint or the Joint Proxy Statement / Prospectus of Contango Oil and Gas Co. and Crimson Exploration, Inc. (the "Proxy Statement").[4]  The Proxy Statement indicates that in recent years the Crimson Board and

---

[4]    Facts taken from the Proxy Statement will be cited accordingly; uncited statements come from the Complaint.  Consideration of the Proxy Statement is appropriate in resolving the pending motions to dismiss for the reasons stated in note 38 *infra*.

8

management pursued various potential strategic transactions with other companies and private equity firms, but that, for various reasons, none of those opportunities panned out. Near the end of 2012, management and the Board decided to attempt to identify strategic opportunities more objectively and then pursue them. To that end, Crimson engaged Barclays Capital Inc. ("Barclays") as a financial advisor in early January 2013.[5]

Both the Complaint and the Proxy Statement trace the genesis of the Merger to a conversation between Contango acting CEO Brad Juneau and a Crimson manager at a youth sporting event in early January 2013. After those discussions were reported up the chain of command, Juneau and Keel conferred by telephone on January 9, 2013. Juneau and Keel discussed each company's respective business objectives: Contango sought to diversify its asset base while Crimson desired more working capital to exploit its existing opportunities and increase growth.[6] Contango had only nine full-time employees and lacked depth in management. Thus, as the Complaint repeatedly emphasizes, many members of Crimson's management expected positions in the new company.

Discussions continued over the following weeks. According to the Complaint, management was proceeding without the permission of the Crimson Board. One week after the January 9, 2013, telephone call, Keel, Grady, and Atkins met with Joseph J. Romano, Contango's interim CEO, to discuss the possibility of either a strategic combination or a joint venture to develop the Woodbine properties. The Crimson

---

[5]      Proxy Statement 50-51.

[6]      *Id.* at 51.

executives concluded from this meeting that a strategic combination would be superior.[7] Over the next several days, they and Contango negotiated the terms of a confidentiality agreement, which the parties signed by January 21, 2013.[8] Due diligence by both companies followed. Keel and Grady met on January 29 with Barclays to discuss its initial work on evaluating some six different strategic alternatives for Crimson. Crimson management informed Barclays of the preliminary negotiations with Contango, but they had not yet advised the Board about those negotiations. Keel and Grady had a follow-up meeting with Barclays on January 31.[9]

During a telephone call on February 5, 2013, Romano and Keel established a preliminary equity split of 80/20 in favor of Contango. According to the Proxy Statement, that figure was based on preliminary net asset value analyses performed by each company and each company's then-current market capitalization.[10] Keel first contacted representatives of Oaktree regarding a potential merger with Contango on February 6. Oaktree responded favorably. On February 12, Grady and Thomas, Crimson's general counsel, engaged Vinson & Elkins LLP ("Vinson & Elkins") to serve

---

[7]     *Id.* at 51.

[8]     *Id.* at 52. Although the Complaint, ¶ 54, states that the parties executed the confidentiality agreement on January 17, this apparent date discrepancy is immaterial.

[9]     Proxy Statement 52.

[10]     *Id.*

10

as legal counsel on matters related to the potential merger.[11] The same day, Keel and Romano met to discuss the proposed transaction. On the subject of Crimson's outstanding debt, Romano asked whether Oaktree would consider converting the debt it held under the Second Lien to equity. Oaktree ultimately would reject that request. As negotiations continued, members of Crimson management met with Contango's financial advisors to receive briefings on Contango's properties and assets, including its land contracts.[12] On February 15, Keel and Grady agreed with Romano that an 80/20 split still seemed appropriate. The Complaint alleges, however, that Barclays had not provided Crimson with any valuation or analysis of the proposed deal at this point.

On February 26, 2013, Crimson's Board of Directors held a special meeting to consider the proposed transaction. Based on the information presented by management, the Board responded favorably to continuing negotiations with Contango. Although the Company already was utilizing Barclays for a review of strategic alternatives, the Board also retained Barclays to serve as the Company's financial advisor on the proposed transaction.[13] According to the Proxy Statement, between late February and late April, 2013, members of Crimson management—primarily Keel and Grady—spoke numerous times with Board members, as well as with representatives of Oaktree and ACEC, about the discussions with Contango, the status and results of the due diligence review, and

---

[11]     *Id.* at 53.

[12]     *Id.*

[13]     *Id.* at 54.

11

other matters relevant to the Merger. Romano also met several times informally with members of Crimson's Board.[14]

Talks continued through March 2013. On March 5, Grady, Keel, and Thomas met with Vinson & Elkins to discuss the fiduciary duties of the members of Crimson's Board.[15] On March 8, Romano met with Ford, as a representative of Oaktree, to discuss the possibility of exchanging Oaktree's debt under the Second Lien for equity. Ford responded that Oaktree would not agree to such an exchange. Four days later, the Board held its regularly scheduled meeting. Vinson & Elkins reviewed with the Board their fiduciary duties as directors in connection with a strategic merger. Members of management presented information derived from due diligence and informed the Board of their justifications for the business combination with Contango.[16] Barclays also attended the meeting and presented the previously requested strategic review options, as well as the firm's preliminary assessment of the proposed transaction with Contango. Barclays advised the Board that the Company would need significant capital to fully exploit its assets. In that regard, Barclays suggested a merger with a better-capitalized company, a sale of the Company, or a recapitalization as possible ways of acquiring that capital.[17] After discussing these options, the Board found that a strategic merger would

---

[14]    *Id.*

[15]    *Id.* at 55.

[16]    *Id.*

[17]    *Id.* at 56.

12

be most attractive. Based on this conclusion and the preliminary information it had received, the Board determined that a merger with Contango would provide a significant enhancement in stockholder value.[18]

During the second half of March, 2013, Crimson management met with various representatives of Contango regarding executive employment following the proposed merger. In addition, discussions, diligence, and negotiations regarding the terms of the merger agreement, including various deal protection measures, continued through April.[19] The Crimson Board met telephonically on April 11, 2013, with senior management and representatives from Vinson & Elkins and Barclays to discuss remaining issues regarding the Merger.[20]

Two significant events occurred in mid-April. First, Oaktree sought a Registration Rights Agreement ("RRA") so that it could sell its stock in the combined entity in a private placement. Oaktree retained Kirkland & Ellis LLP to negotiate that agreement. Crimson, Contango, and Oaktree participated in the negotiation of the RRA from April 13 to April 25, 2013.[21] Second, based on the results of its diligence, Contango downwardly revised the estimates of its proved offshore reserves. Thereafter, on April 25, Keel and Romano agreed to a revised equity split of 79.7/20.3.

---

[18]     *Id.*

[19]     *Id.* at 59.

[20]     *Id.* at 60.

[21]     *Id.*

13

The negotiations drew to a close in late April 2013. On April 27, the Crimson Board held a telephonic meeting to discuss the Merger and received updates on developments from senior management, Barclays, and Vinson & Elkins. The Board authorized management to finalize the remaining terms,[22] and met again on April 29 to discuss final terms with management and Barclays. Barclays provided its oral opinion that, based on the exchange ratio stated above, the deal was fair, from a financial point of view, to Crimson stockholders.[23] The Board approved the Merger. Director Ni was not present at this meeting, but he later expressed his support for the Merger. Senior management from Crimson and Contango signed the final merger agreement ("Merger Agreement") later in the evening. Crimson and Contango announced the Merger the next day, April 30.

### 4. The Merger Agreement

The terms of the Merger Agreement called for Contango to acquire Crimson in consideration for 0.08288 shares of Contango for each share of Crimson. This exchange ratio represented a price of approximately $3.19 per share, a 7.7% premium based on the April 29, 2013, trading price of Contango common stock and Crimson common stock. After the Merger, Crimson stockholders owned roughly 20.3% of the combined entity. The now-completed transaction required a majority vote of both Crimson and Contango stockholders. Support agreements entered into in connection with the Merger Agreement

---

[22] *Id.* at 62.

[23] *Id.* at 63. Barclays provided a written fairness opinion to the Board later the same day.

locked up some 37.25% of the Crimson stock in favor of the merger.[24]  As noted in sections I.A and I.B *supra*, numerous members of Crimson management continued to hold positions in the combined entity.

The Merger Agreement included several deal protection measures, including a $7 million termination fee and up to a $4.5 million expense fee.  The termination fee represents roughly 1.8% of Crimson's enterprise value.[25]  Subject to a fiduciary out, Crimson also agreed to a no-solicitation provision and to provide Contango with matching rights for any superior proposal.  Plaintiffs also emphasize that the deal lacked any collar mechanism setting a floor on the trading price of Contango shares.

### 5.  Alleged side consideration

Plaintiffs rely heavily on alleged side consideration provided to Crimson management and Oaktree that was not shared with the common stockholders.  It is undisputed that Oaktree received the RRA it sought and that Contango agreed to pay off the entire Second Lien, including a 1% prepayment penalty (the "Prepayment").  These two items are discussed in greater detail below in the context of the Court's analysis of whether Oaktree competed with the common stockholders for consideration.  I note, however, that the Complaint does not allege that Oaktree demanded that the Second Lien

---

[24]  As alleged in the Complaint, this number included Oaktree's 33.7% ownership and the collective ownership of former Crimson management of approximately 3.5% of Crimson's common stock.

[25]  Proxy Statement 60.  The total deal value was $390 million, including the assumption of $244 million in long-term debt.  The termination fee amounted to 4.49% of the equity value.

15

be repaid in advance in connection with the closing of the Merger. Indeed, the Proxy Statement said only that it is "anticipated that, at or immediately following the effective time of the merger, Crimson's [Second Lien] . . . will be terminated and any indebtedness thereunder repaid."[26] The Proxy Statement similarly stated that the parties expected that Crimson's Senior Credit Agreement, along with Contango's comparable senior debt, would be "amended, restated or replaced."[27] The Complaint also reviews, at length, the salary increases and new employment agreements that Crimson management were to receive and the amounts that were to be paid to them through accelerated vesting of stock options and various other change-in-control payments.

### D. Procedural History

After certain initial matters, including consolidation and the appointment of lead counsel for Plaintiffs, Plaintiffs filed the Complaint on September 13, 2013. Defendants moved to dismiss. The parties completed their briefing on the motions to dismiss on January 27, 2014.[28] The next day, January 28, Angelo Fisichella, as trustee for a trust that owned stock in Crimson, moved to intervene in this action on behalf of the trust and the common stockholders of Crimson. Defendants opposed that motion and it, too, was

---

[26]   *Id.* at 112.

[27]   *Id.* at 111.

[28]   Briefing on the motions to dismiss consisted of Contango's Opening Brief ("Contango Br."), Crimson's Opening Brief ("Crimson Br."), Plaintiffs' Opposition Brief ("Pls.' Opp'n Br."), and Defendants' Reply Brief ("Defs.' Reply Br.").

16

the subject of full briefing.[29] On February 25, the Court heard argument on the motions to dismiss and briefly discussed with the interested parties the pending motion to intervene (the "Argument"). Ultimately, the Court decided to stay the motion to intervene pending resolution of the motions to dismiss.[30] This Memorandum Opinion resolves all pending motions.

### E. Parties' Contentions

Plaintiffs allege that this transaction undervalues the Company and deprives the stockholders of receiving fair value for their shares. According to Plaintiffs, Oaktree, as Crimson's controller, caused the Company to be sold for a grossly inadequate price and received significant side benefits not shared with the minority common stockholders, such as the Prepayment and the RRA. On that basis, Plaintiffs contend that entire fairness applies and Oaktree cannot satisfy that demanding standard of review. Management's complicity in this scheme stems from their self-interested employment agreements with the surviving company. Rather than negotiating a superior exchange ratio, Plaintiffs allege, senior management instead focused on effectively extracting for themselves extensions of their employment agreements and higher salaries. Similarly, Plaintiffs aver that the Director Defendants authorized the Merger because they: (1) were

---

[29] Briefing on the motion to intervene consisted of the Intervenor's Opening Memorandum ("Intervenor's Mem."), Defendants' Answering Brief ("Defs.' Opp'n to Intervention"), and the Intervenor's Reply Brief ("Intervenor's Reply").

[30] Arg. Tr. 15 ("I'll defer until a decision on this motion to dismiss any action on the motion to intervene.").

interested in the Merger themselves; (2) lacked independence because Oaktree dominated them; or (3) acted in bad faith.

Plaintiffs base their claims, in part, on a series of management presentations before the Merger was announced in which Keel and Grady suggested Crimson's share value significantly exceeded the amount received as merger consideration. Plaintiffs also allege that, seemingly to provide cover for the Merger, the insiders artificially depressed Crimson's valuation with a suspiciously timed accounting impairment of the Company's natural gas assets. Plaintiffs further assert that Barclays suffered from conflicts of interest in this transaction. Finally, Plaintiffs claim that Contango and the Merger Sub aided and abetted the Crimson Defendants' breaches of fiduciary duties.[31]

Defendants argue first and foremost that Oaktree was not a controlling stockholder. But, even if Oaktree was a controller, Defendants contend, Plaintiffs have not pled sufficient facts to trigger entire fairness review. Defendants challenge the adequacy of Plaintiffs' allegations, reviewed under the more defendant-friendly standard of the business judgment rule, to state a claim for breach of fiduciary duty. That is,

---

[31] Plaintiffs also challenge in general terms the adequacy of the disclosures in the Proxy Statement, but the Complaint does not allege any specific disclosure violations. Plaintiffs likewise did not seek to enjoin the merger. Furthermore, even assuming the Complaint adequately pled a disclosure violation, such a violation would support, at most, a breach of the Director Defendants' duty of care. Because, as discussed in Section II.E.2 *infra*, Crimson's Certificate of Incorporation provides for exculpation to the fullest extent allowed by Delaware law, such a breach would not support Plaintiffs' claim for money damages. Therefore, Defendants' motions to dismiss any disclosure claims that might be asserted is well-founded, and I will not address those claims further.

18

absent Oaktree as a conflicted controller, Plaintiffs have not alleged sufficient facts to support a reasonable inference that a majority of the Crimson Board either was interested in or lacked independence regarding the merger or approved the Merger in bad faith. Thus, according to Defendants, Plaintiffs have failed to state a claim for breach of the duty of loyalty. Furthermore, the exculpatory provision in Crimson's Certificate of Incorporation bars any remaining duty of care claims against the Director Defendants. Contango, for its part, maintains that the aiding and abetting claims fail because there was no underlying breach of fiduciary duty. But, even if there was, Contango says, Plaintiffs failed adequately to allege any knowing participation by Contango or the Merger Sub in any such breach, including a breach of the duty of care.

## II.     ANALYSIS

### A.     Standard of Review for Motion to Dismiss

Pursuant to Rule 12(b)(6), this Court may grant a motion to dismiss for failure to state a claim if a complaint does not assert sufficient facts that, if proven, would entitle the plaintiff to relief. As recently reaffirmed by the Supreme Court, "the governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[32] That is, when considering such a motion, a court must:

> accept all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as "well-pleaded" if they provide the defendant notice of the claim, draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under

---

[32]     *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011) (footnote omitted).

19

any reasonably conceivable set of circumstances susceptible of proof.[33]

This reasonable "conceivability" standard asks whether there is a "possibility" of recovery.[34] The court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[35] Failure to plead an element of a claim precludes entitlement to relief and, therefore, is grounds to dismiss that claim.[36]

Generally, the Court will consider only the pleadings on a motion to dismiss under Rule 12(b)(6). "A judge may consider documents outside of the pleadings only when: (1) the document is integral to a plaintiff's claim and incorporated in the complaint or (2) the document is not being relied upon to prove the truth of its contents."[37] Under at least the first exception, I find that consideration of the Proxy Statement is appropriate in resolving this dispute.[38]

---

[33] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002)).

[34] *Id.* at 537 & n.13.

[35] *Price v. E.I. duPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

[36] *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 972 (Del. Ch. 2000) (Steele, V.C., by designation).

[37] *Allen v. Encore Energy P'rs*, 72 A.3d 93, 96 n.2 (Del. 2013).

[38] The Proxy Statement is "integral to [Plaintiffs'] complaint as it is the source for the merger-related facts as pled in the complaint." *Orman v. Cullman*, 794 A.2d 5, 16 (Del. Ch. 2002). Although Plaintiffs do not state this fact directly, one cannot read the Complaint in the context of the Proxy Statement without drawing such a conclusion. In that regard, I also note that Plaintiffs referenced the Proxy

20

## B. Tiers of Scrutiny

The "reasonable conceivability" pleading standard asks whether the allegations in the complaint could entitle a plaintiff to relief. Whether a plaintiff's allegations would entitle her to relief, however, depends upon the level of scrutiny under which those allegations are reviewed. The parties here vigorously dispute the proper standard of review. Two standards of review potentially could apply:[39] the business judgment rule or entire fairness. Accordingly, I begin my analysis by examining the appropriate standard of review.

### 1. Business judgment rule

Under 8 *Del. C.* § 141(a), the business and affairs of a corporation are managed under the direction of the board of directors. The business judgment rule is a principle of prudence and discretion that "operates to preclude a court from imposing itself

---

Statement in the Complaint, Compl. ¶¶ 139, 141, cited it repeatedly in their Opposition Brief, Pls.' Opp'n Br. 10, 11, 13, 14, 42, 46, 48, and did not object to Defendants' reliance upon it.

[39] A third level of scrutiny, enhanced scrutiny, applies when, for example, directors set out to sell the company in a bidding process, break up the company, or otherwise engage in a change-of-control transaction. *See Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173 (Del. 1986). *Revlon* does not apply here because the challenged Merger was a stock-for-stock transaction involving widely held, publicly traded companies. *See generally Paramount Commc'ns, Inc. v. QVC Network, Inc.,* 637 A.2d 34, 46-47 (Del. 1994) (quoting *Paramount Commc'ns, Inc. v. Time Inc.*, 1989 WL 79880, 15 Del. J. Corp. L. 700, 739 (Del. Ch. July 17, 1989)) (noting that there is no sale or change-in-control in a stock-for-stock merger where control of both companies remains dispersed among the public stockholders). Consequently, I have limited my focus in this Memorandum Opinion to the business judgment rule and entire fairness.

unreasonably on the business and affairs of a corporation."[40] The rule "in effect provides that where a director is independent and disinterested, there can be no liability for corporate loss, unless the facts are such that no person could possibly authorize such a transaction if he or she were attempting in good faith to meet their duty."[41] The "rule posits a powerful presumption in favor of actions taken by the directors in that a decision made by a loyal and informed board will not be overturned by the courts unless it cannot be 'attributed to any rational business purpose.'"[42]

Practically, the business judgment rule means that litigants challenging a board's decision face an uphill battle. Rather than question the wisdom of the decision itself, under the business judgment rule, the court instead will examine the process by which the board of directors reached its decision and, if the process is reasonable, the court will defer to the decisions of the board.[43] The court also will determine whether the action was taken by a board majority comprised of disinterested and independent directors.[44] If

---

[40] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 360 (Del. 1993).

[41] *Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1052-53 (Del. Ch. 1996).

[42] *Cede*, 634 A.2d at 361 (quoting *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971)).

[43] *See Globis P'rs, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at *4 (Del. Ch. Nov. 30, 2007).

[44] *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984).

the challenger successfully rebuts the rule's presumptive applicability, the burden shifts to the defendants to prove the transaction's entire fairness.[45]

## 2. Entire fairness

"[E]ntire fairness is the highest standard of review in corporate law. It is applied in the controller merger context as a substitute for the dual statutory protections of disinterested board and stockholder approval, because both protections are potentially undermined by the influence of the controller."[46] The entire fairness standard involves an inquiry into two interrelated concepts: fair dealing and fair price.

> The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and stockholders were obtained. The latter aspect of fairness relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock.[47]

The two fairness aspects require looking to different factors, but the court does not conduct a bifurcated inquiry and instead examines the whole transaction for its entire fairness.[48]

---

[45] *Globis P'rs*, 2007 WL 4292024, at *5.

[46] *Kahn v. M&F Worldwide Corp.*, 88 A.3d 635, 644 (Del. 2014).

[47] *Emerald P'rs v. Berlin*, 787 A.2d 85, 97 (Del. 2001) (quoting *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983)).

[48] *See, e.g.*, *Cinerama v. Technicolor*, 663 A.2d 1156, 1172 (Del. 1995).

As noted in the previous section, one method of triggering entire fairness review is to rebut the presumptive applicability of the business judgment rule. Certain actions by controlling stockholders also will trigger entire fairness review. This case involves two different contested issues related to the law of controlling stockholders: (1) when is a stockholder a controlling stockholder?; and (2) which transactions involving a controlling stockholder implicate entire fairness? I address these issues first.

### a.     When does a stockholder become a controlling stockholder?

Not surprisingly, Delaware law treats a majority stockholder as a controlling stockholder.[49] Exceeding the 50% mark, however, is only one method of determining whether a stockholder controls the company. A stockholder who "exercises control over the business affairs of the corporation" also qualifies as a controller.[50] A significant number of cases examine whether a minority stockholder nevertheless exercised control over a corporation. The following is a non-exhaustive list of significant cases where the parties disputed whether a non-majority stockholder satisfied this actual control test.

---

[49]     *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113 (Del. 1994).

[50]     *Id.* at 1113-14 (quoting *Ivanhoe P'rs v. Newmont Mining Corp.*, 535 A.2d 1334, 1344 (Del. 1987)); *see also Weinstein Enters., Inc. v. Orloff*, 870 A.2d 499, 507 (Del. 2005) ("For a stockholder that owns less than a numerical majority of a corporation's voting shares to be deemed a controlling stockholder for purposes of imposing fiduciary obligations, the plaintiff must establish the actual exercise of control over the corporation's conduct by that otherwise minority stockholder.")

24

| Case | Posture | Share % | Controller? |
|---|---|---|---|
| *O'Reilly v. Transworld Healthcare, Inc.*[51] | Mot. to Dismiss ("MTD") | 49+[52] | Yes |
| *In re W. Nat'l Corp. S'holder Litig.*[53] | Summ. J. | 46 | No |
| *Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*[54] | MTD | 44 | No |
| *Kahn v. Lynch* | Post-Trial | 43.3 | Yes |
| *In re Primedia, Inc. Deriv. Litig.*[55] | MTD | 40.34+ | Yes |
| *In re Sea-Land Corp. S'holder Litig.*[56] | MTD | 39.5 | No |
| *In re Cysive, Inc. S'holder Litig.*[57] | Post-Trial | 35+ | Yes |
| *N.J. Carpenters Pension Fund v. infoGROUP, Inc.*[58] | MTD | 34-37[59] | ??[60] |
| *In re PNB Hldg. Co. S'holder Litig.*[61] | Post-Trial | 33.5 | No |
| *In re Morton's Rest. Gp., Inc. S'holder Litig.*[62] | MTD | 27.7 | No |

[51]  745 A.2d 902 (Del. Ch. 1999).

[52]  Some cases involved options to purchase additional shares or a potential control group, here indicated by a "+" symbol. The number listed in the "Share %" column indicates the minimum amount of shares the alleged controller held.

[53]  2000 WL 710192 (Del. Ch. May 22, 2000).

[54]  2006 WL 2521426 (Del. Ch. Aug. 25, 2006).

[55]  910 A.2d 248 (Del. Ch. 2006).

[56]  1987 WL 11283 (Del. Ch. May 22, 1987).

[57]  836 A.2d 531 (Del. Ch. 2003).

[58]  2011 WL 4825888 (Del. Ch. Oct. 6, 2011).

[59]  The ownership interest in *infoGROUP* is unclear. At one point, the complaint asserts that Gupta, the alleged controller, beneficially owned roughly 37%, but later states that Gupta had approximately a 34% investment in the company. The opinion similarly references both numbers. 2011 WL 4825888, at *1, 10.

[60]  As discussed below, while the court found that Gupta dominated the board, it is unclear if the court determined whether Gupta was a controlling stockholder.

[61]  2006 WL 2403999 (Del. Ch. Aug. 18, 2006).

[62]  74 A.3d 656 (Del. Ch. 2013).

As this table makes clear, the cases do not reveal any sort of linear, sliding-scale approach whereby a larger share percentage makes it substantially more likely that the court will find the stockholder was a controlling stockholder. Instead, the scatter-plot nature of the holdings highlights the importance and fact-intensive nature of the actual control factor. Examining this factor reveals why, in *Cysive*, Chief Justice Strine, writing as a Vice Chancellor, found a 35% stockholder controlled the corporation, while, in *Western National*, Chancellor Chandler held that a 46% stockholder was not a controller.

In the seminal case of *Kahn v. Lynch*, Alcatel owned 43.3 percent of Lynch Communications. In finding that Alcatel acted as a controller, the Delaware Supreme Court noted the following factors: (a) Alcatel designated five of the eleven members of the board; (b) the record was replete with instances of Alcatel making its will known to the board and then prevailing in its wishes;[63] (c) certain non-Alcatel board members testified that the Alcatel representative terrified them; and (d) Alcatel dominated the merger discussions and threatened a hostile takeover if the board did not comply. Overall, Alcatel demonstrated a high degree of control.

In contrast to *Lynch*, the evidence of actual control was much less convincing in the *Western National* and *Superior Vision* cases. *Western National* featured a passive 46% stockholder, American General Corp., that was subject to a standstill agreement that prevented it from acquiring more shares without board permission and limited it to

---

[63]    For example, an Alcatel representative informed the Lynch board that: "'You must listen to us. We are 43 percent owner. You have to do what we tell you.'" *Lynch*, 638 A.2d at 1114.

26

appointing only two directors to the eight-member board.[64]  When American General indicated it would not sell its shares to a third party in a merger, the Western National board began exploring with American General the possibility that it might buy the remainder of the company.  A special committee negotiated a Western National/American General merger, which 99.98 percent of voting stockholders approved.[65]  Although the court thoroughly examined the question, it found that American General did not dominate the board or the special committee.

The *Superior Vision* decision involved the rather unusual situation of Superior Vision suing ReliaStar, its largest stockholder, because ReliaStar refused to vote in favor of dividends Superior Vision wished to pay.  The court focused on whether ReliaStar exercised control over the board of directors as to the transaction in question, but found no such domination.[66]  Indeed, the board and the alleged controller were at loggerheads about corporate dividend policy and ReliaStar invoked a contractual right it previously obtained from the company to vote against such dividends.  The court declined to find that such a large stockholder acting in its own self interest pursuant to a contractual right owed any fiduciary duties to the company or the other stockholders.

---

[64]   *Western Nat'l*, 2000 WL 710192, at *2.

[65]   *Id.* at *5.

[66]   *Superior Vision*, 2006 WL 2521426, at *4 ("[T]he focus of the inquiry has been on the de facto power of a significant (but less than majority) shareholder, which, when coupled with other factors, gives that shareholder the ability to dominate the corporate decision-making process.").

27

At the other end of the spectrum are *Cysive* and *infoGROUP*. The stockholders found to be controlling in each of those cases owned significantly less than a majority of the shares, though still a percentage larger than Oaktree in this case. *Cysive* involved Nelson Carbonell, the company's founder, CEO, chairman, and a 35% stockholder, who also employed his brother and brother-in-law in high-ranking positions at the company.[67] If his stock holdings were combined with the holdings of his close family member managers and the group's options to purchase shares, Carbonell could command as much 40% of the common stock. This combination of stockholdings and embedded managerial oversight allowed Carbonell "as a practical matter . . . to control the corporation."[68]

As to the *infoGROUP* case, it is not clear whether it involved a controlling stockholder question analogous to what is presented here.[69] In *infoGROUP*, the court denied the defendants' motion to dismiss merger-related duty of loyalty claims on the grounds that the complaint adequately alleged that a majority of the directors lacked independence from Gupta, a director and the alleged controller, who the court found was interested in the transaction because of a unique liquidity need.[70] The court found that

---

[67] *Cysive*, 836 A.2d at 533-35.

[68] *Id.* at 553. In a later case, then-Chancellor Strine noted that, in the *Cysive* opinion, "this court made, perhaps, its most aggressive finding that a minority blockholder was a controlling stockholder." *Morton's Rest. Gp.*, 74 A.3d at 665.

[69] *infoGROUP*, 2011 WL 4825888, at *8 ("The crux of this claim is that, at the time the Merger was approved, Gupta was an interested director and the remaining directors were controlled by him, and thus, not independent.")

[70] *Id.* at *9-10 (noting that Gupta owed over $20 million and had no discernible cash flow since being forced out as the company's CEO, a liquidity problem that

Gupta, as an interested director, potentially dominated the remaining board members "through a pattern of threats that could, arguably, have intimidated the Board Defendants."[71] These allegations sufficed to survive a motion to dismiss.

These cases[72] show that a large blockholder will not be considered a controlling stockholder unless they actually control the board's decisions about the challenged transaction. *Lynch* involved a controller who literally dominated the boardroom and threatened a hostile takeover; *Cysive* involved managerial dominance combined with an ability to muster up to 40% of the common stock; and *infoGROUP* involved a potential 37% stockholder, who was the founder and ousted CEO, but remained on the board and allegedly dominated the other directors, who "succumbed to [his] control after being cowed by his threats and hostile, erratic behavior."[73] Absent a significant showing such as was made in these prior cases, the courts have been reluctant to apply the label of

plaintiffs alleged caused him to force the board to sell the company at a significant discount to its true worth).

[71]    *Id.* at *11.

[72]    I do not consider the *O'Reilly* and *Primedia* cases instructive here, because those cases appear to have involved majority stockholders. That is, the plaintiffs at least alleged sufficient facts to find as much at the motion to dismiss stage. The 49% controller in *O'Reilly* also held significant amounts of the company's debt and an option to purchase 2% of the company's stock. *O'Reilly*, 745 A.2d at 908. *Primedia* involved several related investment entities of Kohlberg Kravis Roberts & Co. L.P. ("KKR"). The complaint alleged a KKR affiliate served as the general partner and sole voting power of six limited partnerships holding 40.34% of the company. A separate KKR affiliate, through a series of interlocking entities, was alleged to have a 20.91% ownership interest in the company, for a total of over 61%. *Primedia*, 910 A.2d at 251.

[73]    *infoGROUP*, 2011 WL 4825888, at *7.

29

controlling stockholder—potentially triggering fiduciary duties—to large, but minority, blockholders.

**b.       Which transactions involving a controlling stockholder trigger entire fairness review?**

Entire fairness is not triggered solely because a company has a controlling stockholder. The controller also must engage in a conflicted transaction. This section describes those conflicted controller transactions where the courts have applied entire fairness review. As relevant to the dispute before me, those situations fall into one of two categories: (a) transactions where the controller stands on both sides; and (b) transactions where the controller competes with the common stockholders for consideration.

Delaware law holds that a "controlling or dominating shareholder standing on both sides of a transaction, as in a parent-subsidiary context, bears the burden of proving its entire fairness."[74] Two decades after *Lynch*, and after numerous cases discussing the nuances of entire-fairness burden-shifting following a majority-of-the-minority vote or negotiation and approval by a special committee of the board, the Delaware Supreme Court issued its opinion in *Kahn v. M&F Worldwide Corp.* ("*MFW*"). In that opinion, the Supreme Court held that a controlling stockholder buyout could be reviewed under the business judgment rule if the controller satisfied a number of procedural requirements.[75] In this case, however, it is undisputed that Oaktree had no pre-Merger relation to Contango. As a result, this variety of conflicted transaction is not before me.

---

[74]    *Lynch*, 638 A.2d at 1115 (citing *Weinberger*, 457 A.2d at 710).

[75]    88 A.3d 639, 645-46 (Del. 2014).

The second variety of controller transactions implicating entire fairness review involves situations where the controller does not stand on both sides of the transaction, but nonetheless receives different consideration or derives some unique benefit from the transaction not shared with the common stockholders. The first subset of these cases will be referred to as the "disparate consideration" cases. In these cases, the corporation enters into a merger or other transaction with a third party and the controller or control group will receive more consideration for their shares, which often include a separate class of high-vote stock, than the minority common stockholders.

*In re Tele-Communications, Inc.* involved such an arrangement. AT&T entered into negotiations to buy a TCI division with high-vote and single-vote stock. The special committee agreed to an extra premium for the high-vote stock in a stock-for-stock merger. This resulted in the high-vote stock receiving $376 million more in consideration than the single-vote stock.[76] According to the court's tally, the board collectively controlled 50.8% of the vote.[77] Five members of the board held 84% of the high-vote shares, meaning that they received an additional $220 million compared to the common stockholders.[78] Entire fairness applied.[79] Similarly, *In re Delphi Financial*

---

[76]   *In re Tele-Communications, Inc. S'holder Litig.*, 2005 WL 3642727, at *7 (Del. Ch. Jan. 10, 2006).

[77]   *Id.* at *2 n.24.

[78]   *Id.* at *7.

[79]   The court applied entire fairness for the reasons stated in the text *supra*, but, in the alternative, also found entire fairness applicable because a majority of the board was interested in the transaction. *Id.* at *8.

involved a 49.9% controller holding high-vote stock who negotiated a substantial premium for his own shares, despite a provision in the company's charter mandating equal consideration for the high-vote and single-vote shares in the event of a merger.[80] In the context of a motion for a preliminary injunction, the court assumed for sake of the motion that the entire fairness standard applied.[81]

The different consideration received by the controller need not be in the form of more money. In one variant, which may be called the "continuing stake" cases, the controller receives different consideration in the form of continuing equity in the surviving entity. For example, *In re John Q. Hammons Hotels* ("*JQH Hotels*") involved a merger between JQH Hotels and an unrelated third party. John Q. Hammons, the 72% controller of JQH Hotels, negotiated with the acquirer separately and, for personal tax and financial reasons, received a combination of a small equity stake in the surviving entity, significant liquidation rights, a large line of credit, and various other contractual rights, while the other stockholders received cash.[82] The board approved these side arrangements along with the merger price for the common stock. The court found that, although Hammons did not stand on both sides of the transaction, he nonetheless was "in a sense 'competing' [with the minority stockholders] for portions of the consideration"

---

[80] *In re Delphi Fin. Gp. S'holder Litig.*, 2012 WL 729232, at *3 (Del. Ch. Mar. 6, 2012).

[81] *Id.* at *12 n.57.

[82] *In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2009 WL 3165613, at *7-8 (Del. Ch. Oct. 2, 2009).

the acquirer was willing to pay.[83] Based on the circumstances and the use of flawed procedural protections for minority stockholders, the court reviewed the transaction for entire fairness.

The plaintiffs advanced a related theory in the *LNR Property* case.[84] There, the controlling stockholder negotiated a cash-out merger, which included an arrangement by which the controller, together with other members of senior management, would roll part of their proceeds into a 25% equity stake in the surviving entity. The board had allowed the controller to negotiate the merger. The allegations that the controller acted as both buyer and seller, and thus was conflicted and may not have sought the highest price, created the potential for entire fairness review and sufficed to avoid dismissal.[85]

The final category of controller-conflict cases will be referred to as the "unique benefit" cases. In these cases, the controller receives some sort of special benefit not shared with the other stockholders. This niche line of cases involves the controller extracting something uniquely valuable to the controller, even if the controller nominally receives the same consideration as all other stockholders.

The recent *Primedia* decision exemplifies a unique benefit case.[86] At the risk of oversimplifying its complex background, the plaintiffs basically alleged that KKR, the

---

[83] *Id.* at *12.

[84] *In re LNR Prop. Corp. S'holder Litig.*, 896 A.2d 169 (Del. Ch. 2005).

[85] *Id.* at 178.

[86] *In re Primedia, Inc. S'holder Litig.*, 67 A.3d 455 (Del. Ch. 2013).

58% controller of Primedia, Inc., breached its fiduciary duties by trading in the company's preferred stock on the basis of material nonpublic information and thus was required to disgorge all of its profits. While the Delaware courts dealt with the initial derivative suits, Primedia began reviewing strategic alternatives and entered into a merger agreement under which it would be acquired by an unrelated third party. KKR provided sufficient written consents to effectuate this transaction. In it, all stockholders received the same monetary consideration.[87] The plaintiffs urged the court, however, to review the merger under entire fairness because KKR received a unique benefit: de facto elimination of the derivative claim against it because the acquiring company would not pursue that claim.[88] The failure to obtain any value for the claim against KKR allegedly rendered the merger unfair to minority stockholders. If successful, the pro rata value of the disgorgement claim to the minority could have been as much as $80 million before interest, while the pro rata merger consideration paid to them amounted to $133 million.[89] The court found the plaintiffs adequately alleged facts requiring entire fairness review.

In another recent case, *Synthes, Inc.*, Chief Justice Strine, then writing as Chancellor, dismissed a complaint challenging a third-party merger where the founder and 38.5% controlling stockholder received the same consideration as every other

---

[87]     *Id.* at 462-67, 472-75.

[88]     *Id.* at 476.

[89]     *Id.* at 482.

34

stockholder.[90]  The plaintiffs advanced the theory, forcefully swatted down by the court, that the controller's estate planning requirements led to a unique need for liquidity that caused the controller to sell the company for less than it was worth.  The court acknowledged that there could be "very narrow circumstances in which a controlling stockholder's immediate need for liquidity could constitute a disabling conflict of interest irrespective of pro rata treatment."[91]  Such a situation, however, would require "a crisis, fire sale where the controller, in order to satisfy an exigent need . . . agreed to a sale of the corporation" without performing the basic sale tasks necessary to achieve a price reflecting the corporation's market value.[92]

In sum, triggering entire fairness review requires the controller or control group to engage in a conflicted transaction.  That conflicted transaction could involve standing on both sides of the transaction, as when a controller buys out the minority, or receiving different consideration than the other stockholders.  In the latter situation, entire fairness is deemed appropriate because the controller is presumed to be competing with the minority stockholders for a larger portion of the total consideration the acquirer is willing to pay.[93]  Delaware courts appear to have identified three types of cases where the

---

[90]     *In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022 (Del. Ch. 2012).

[91]     *Id.* at 1036.  In this portion of its opinion, the court referenced the *infoGROUP* decision as an instance in which the plaintiffs alleged sufficiently dramatic facts for the court to find liquidity to be a unique benefit accruing to the controller, even though all parties received the same consideration.  *See id.* at 1036 n.67.

[92]     *Id.* at 1036.

[93]     *See JQH Hotels*, 2009 WL 3165613, at *12.

controller "competes with the common": (1) the controller receives disparate consideration, which the board approves;[94] (2) the controller receives a continuing stake in the surviving entity, whereas the minority is cashed out; and (3) the controller receives a unique benefit, despite nominal pro rata treatment of all stockholders.

### C.     Is Oaktree a Controlling Stockholder?

### 1.     The potential allegations of a control group

Oaktree controlled 33.7% of Crimson's stock. Perhaps recognizing that this would be an aggressive instance of finding a blockholder to be a controller in a third-party merger, Plaintiffs attempt to include the shares of others in the tally of shares controlled by Oaktree. Although Plaintiffs do not explicitly allege the existence of a control group, the Complaint and Plaintiffs' Opposition Brief sufficiently hint at its existence to put Defendants on notice. For instance, Plaintiffs note that Oaktree, along with several executive officers of Crimson,[95] executed voting agreements in favor of the

---

[94]     In cases where a third party negotiates directly with a controlling stockholder, without board involvement, in an effort to secure the support necessary to approve a transaction, the courts have found no breach of fiduciary duty by the board of directors. *See In re Sea-Land Corp. S'holder Litig.*, 642 A.2d 792 (Del. Ch. 1993) (granting summary judgment for directors in case where third-party tender offeror paid a 39.5% blockholder $5 extra per share—for an option to purchase the entire block—when the board had no involvement in arranging for payment of the extra consideration), *aff'd sub nom. Sea-Land Corp. S'holder Litig. v. Abely*, 633 A.2d 371 (Del. 1993) (Table). For disparate treatment claims to be actionable against the directors, "the board must at least have approved the transaction creating the disparity." *Id.* at 803. *See also In re Novell, Inc. S'holder Litig.*, 2013 WL 322560, at *14 (Del. Ch. Jan. 3, 2013) ("The Board did not breach its fiduciary duties with respect to a transaction it did not approve, and to which [the Corporation] is not a party.").

[95]     The specifics can be found in Section I.A.

Merger, thus locking up 37.25% of the stockholder vote.[96] In the same paragraph, the Complaint alleges that Oaktree, the executive officers, and the Crimson Board together control 52.15% of the vote. The almost 15% differential between these numbers comes from Director Defendant Ni and his affiliated corporate entities. Plaintiffs do not allege that Ni signed a voting agreement. Rather, they aver that, as a "permitted investor" under the Second Lien, "Ni's interests are aligned with Oaktree."[97]

Under Delaware law, in appropriate circumstances, multiple stockholders together can constitute a control group, with each of its members being subject to the fiduciary duties of a controller. The alleged members of a control group, however, must be "connected in some legally significant way"—such as "by contract, common ownership, agreement, or other arrangement—to work together toward a shared goal."[98] The law does not require a formal written agreement, but there must be some indication of an

---

[96]    Compl. ¶ 3.

[97]    *Id.* ¶ 22.

[98]    *Dubroff v. Wren Hldgs., LLC*, 2009 WL 1478697, at *3 (Del. Ch. May 22, 2009).

actual agreement.[99] Plaintiffs must allege more than mere concurrence of self-interest among certain stockholders to state a claim based on the existence of a control group.[100]

Plaintiffs have not met their burden in that regard in this case. They do not plead that Ni signed any voting agreement regarding the Merger or that there is any agreement, formal or otherwise, between ACEC and Oaktree. Instead, the Complaint twice conclusorily alleges an alignment of interests between ACEC and Oaktree.[101] The Court accepts that ACEC was a permitted investor under the Second Lien. But, it is not clear from the Complaint that ACEC *actually* invested in the Second Lien at all.[102] Furthermore, even assuming ACEC held some unspecified portion of the Company's debt under the Second Lien, that allegation, without more, is insufficient to support a reasonable inference that Ni joined forces with Oaktree to form a control group.

---

[99] *See, e.g.*, *PNB Hldg. Co.*, 2006 WL 2403999, at *10 ("The record, though, does not support the proposition that these various director-stockholders and their family members were involved in a blood pact to act together. To that point, there are no voting agreements between directors or family member[s]. Rather, it appears that each had the right to, and every incentive to, act in his or her own self-interest as a stockholder.").

[100] *See Williamson v. Cox Commc'ns, Inc.*, 2006 WL 1586375, at *6 (Del. Ch. June 5, 2006) ("Nor is the allegation that Cox, Comcast and AT & T had parallel interests sufficient to allege that the Cable Companies were part of a 'controlling group.'").

[101] Compl. ¶¶ 22, 75.

[102] The Complaint avers that ACEC's interests conflicted with other stockholders because it was a creditor of Crimson. *Id.* ¶ 58. The Opposition Brief similarly states that ACEC and Oaktree were co-creditors. Pls.' Opp'n Br. 16 n.14. If ACEC had invested in the Second Lien, Plaintiffs presumably would have said so. Yet, Plaintiffs consistently identified ACEC as a "permitted investor" in the Second Lien rather than an "investor." Compl. ¶¶ 22, 77; Opp'n Br. 35, 39.

38

Basically, Plaintiffs ask the Court to infer that, because ACEC could have (and may have) invested in the Second Lien and, because Oaktree did invest in the Second Lien, Oaktree and ACEC were in cahoots.[103] I decline to pile up questionable inferences until such a conclusion is reached. The simple fact that the interests of two entities are aligned is legally insufficient to establish the existence of a control group.[104] Without Ni's shares, the combined holdings of Oaktree, the other Board members, and Crimson senior management remains well short of a majority. Thus, the allegations of the Complaint fail to support a reasonable inference that Oaktree was part of a control group.

## 2. Oaktree's 'control' over Crimson

As previously discussed, to adequately plead that a non-majority blockholder was a controlling stockholder, a plaintiff would have to allege facts to show that the blockholder actually controlled the board's decision about the transaction at issue. The Complaint supplies little in the way of specific allegations of control. Instead, Plaintiffs advance an overarching theory that Oaktree sought to exit its investment in Crimson and, thus, was willing to undersell its shares.[105] Arriving at Plaintiffs' desired conclusion, however, requires drawing a number of inferences from the alleged facts. Some of the natural inferences, however, point in opposite directions.

---

[103] Plaintiffs' conclusory statement that "Oaktree also has substantial ties to Defendant Ni" does nothing to strengthen their argument. Pls.' Opp'n Br. 6.

[104] *See Williamson*, 2006 WL 1586375, at *6.

[105] Plaintiffs effectively assert an aggressive variant of the *infoGROUP* liquidity argument, but they do so on significantly less compelling facts.

39

The Complaint repeatedly highlights the longstanding relationship between Keel and Oaktree.[106] For example, Plaintiffs allege that Keel and Grady sought and received Oaktree's approval for the proposed merger before bringing it to the attention of the Crimson Board.[107] The Complaint, however, also asserts that the merger price was unfair and that the directors undersold the Company.[108] Plaintiffs further allege that, instead of negotiating a higher premium for the common stockholders, Keel and the rest of management focused on securing their own post-merger employment.[109]

Inferences that might be drawn from these allegations include: (1) Keel was Oaktree's underling and the pair colluded to advance their own interests at the expense of the common stockholders; (2) Keel and other management members sought to benefit themselves at the expense of the common stockholders; and (3) the common stockholders should have received a higher premium. The reasonableness of these inferences is questionable, however. For example, Oaktree would suffer the most from a low merger price, given its holdings of over 15.5 million shares, and thus would need to secure significant side benefits to overcome that loss. Similarly, Keel would need to negotiate personal gains large enough to offset the loss from accepting a lower-than-necessary

---

[106] *E.g.*, Compl. ¶¶ 16, 19, 40, 52, 75. Plaintiffs' Opposition Brief similarly emphasizes that relationship. *E.g.*, Pls.' Opp'n Br. 4-6.

[107] Compl. ¶ 58.

[108] *E.g.*, *id.* ¶¶ 4, 68, 79, 80, 86-100.

[109] *Id.* ¶ 59 ("Moreover, rather than discuss any improvement to the exchange ratio, Crimson and Contango representatives discussed future employment and salaries.").

exchange ratio. Those gains also would have to be significant given his holdings of over one million shares and right to accelerated vesting of restricted stock as a result of the merger.

Any damage to Keel because of a lower exchange ratio would impact Oaktree fifteen times as much, given its much larger stock holdings. As such, Keel's allegedly negotiating a better employment package for himself instead of increasing the exchange ratio could have cost Oaktree substantially. As for Crimson management, inferring that they would favor their own interests over those of the stockholders is inconsistent with Oaktree's alleged control over management, because management's successfully securing new corporate perquisites in that way would not advance Oaktree's interests. Lastly, I note that ACEC, as Crimson's second largest stockholder, would have no incentive to undersell its shares.

Overall, Plaintiffs' allegations simply do not support a reasonably coherent theory as to why the key players would undersell their millions of shares. Here, Oaktree controlled over one-third of the common shares and may have been Crimson's largest creditor. Three of the seven Board members worked for Oaktree and, according to Plaintiffs, Oaktree "designated a majority of the Board as well as senior management."[110] Although Keel did not work for Oaktree, Plaintiffs argue that his "fealty to Oaktree cannot be seriously questioned."[111] But, the focus in a control analysis is on domination

---

[110]  Pls.' Opp'n Br. 4.

[111]  *Id.*

41

of the board with regard to the transaction at issue. There are no specific allegations from which a court reasonably could infer that Oaktree, alone or in combination with others, actually exercised control over Crimson or the negotiation of the Merger. In *Cysive*, by contrast, the 35-40% controller was himself the CEO and founder of the target company and had installed his family members in high management positions, creating a concentration of power that purportedly allowed managerial and board domination. Similarly, *infoGROUP* involved an overbearing former CEO who allegedly terrorized the other members of the board with a series of threats and erratic behavior. Oaktree, the alleged controller in this case, is an outside investment fund. Moreover, the lead negotiators, Keel and Grady, were not employed by Oaktree.

At this stage, however, all reasonable inferences must be drawn in favor of Plaintiffs, and they only need to show it is reasonably conceivable that Oaktree controlled Crimson. Having considered all of the allegations and the available record, I am hesitant to conclude that Plaintiffs could not conceivably make that showing. Regardless, as the next section shows, even assuming that Oaktree did control Crimson, entire fairness still does not apply in this case.

### 3. Is the entire fairness standard implicated?

Section II.B.2.b *supra* identified three types of conflicted transactions involving a controlling stockholder that would trigger entire fairness. The Crimson-Contango Merger involved a stock-for-stock merger where each Crimson stockholder received the same number of Contango shares. Plaintiffs have not alleged that Oaktree stood on both sides of the transaction and it is undisputed that Contango was an unrelated third party.

42

This was not a going-private transaction or a parent-subsidiary merger. Similarly, Plaintiffs have not alleged that the controller received a continuing stake in the surviving entity while the remaining stockholders were cashed out. Instead, Plaintiffs argue that Oaktree "competed" for consideration with Crimson's minority stockholders.[112] In terms of the Court's taxonomy, Plaintiffs allege some combination of disparate consideration (the Prepayment) and receipt of a unique benefit (the RRA). In the end, however, Plaintiffs failed adequately to plead a conflicted transaction by a controller.

Stockholders generally are presumed to have an incentive to seek the highest price for their shares. That inference or presumption is even stronger in the case of large stockholders.[113] Besides being a matter of common sense, Delaware courts frequently

---

[112] Pls.' Opp'n Br. 31.

[113] *See, e.g*, *In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1035 (Del. Ch. 2012) ("Controlling stockholders typically are well-suited to help the board extract a good deal on behalf of the other stockholders because they usually have the largest financial stake in the transaction and thus have a natural incentive to obtain the best price for their shares."); *In re CompuCom Sys., Inc. S'holder Litig.*, 2005 WL 2481325, at *6 (Del. Ch. Sept. 29, 2005) ("Generally speaking, a controlling shareholder has the right to sell his control share without regard to the interests of any minority shareholder, so long as the transaction is undertaken in good faith. The same has long been true as a general proposition when a parent chooses to negotiate for the sale of a subsidiary corporation to an independent third party. The reasons for the law's tolerance of such sales is clear—as the owner of a majority share, the controlling shareholder's interest in maximizing value is directly aligned with that of the minority."); *Goodwin v. Live Entm't, Inc.*, 1999 WL 64265, at *27 (Del. Ch. Jan. 25, 1999) ("To the extent a plaintiff shareholder . . . is to challenge the independence of directors based solely upon their election by and relationship to a controlling stockholder in a situation like this, he has an obligation to produce record evidence demonstrating that the controlling stockholder's commercial interests were of such a substantial nature as to possibly compromise its natural desire to obtain the best price for its shares.").

43

have made statements to the same effect.[114] Plaintiffs ask this Court to disregard this natural inference and instead conclude that Crimson management, the Board, ACEC, and the Company's largest stockholder, Oaktree, approved this merger against their self-interested incentives as stockholders to maximize value. Plaintiffs have not alleged any specific facts or theories persuasive enough to render it reasonable for me to draw this inference.

Besides the RRA and the Prepayment, Oaktree received the same payment as all stockholders in the Merger.[115] As a preliminary matter, the Court is mindful of the precedent holding that side deals between an acquirer and a controller, which the board did not approve and to which the corporation is not a party, do not implicate entire fairness.[116] As to the Prepayment, I accept as fact that Contango agreed to pay the loan

---

[114] *See e.g.*, *In re OPENLANE, Inc. S'holder Litig.*, 2011 WL 4599662, at *7 (Del. Ch. Sept. 30, 2011) ("[T]hat, collectively, the Board had more to lose or gain from a change of control transaction than any other [Company] shareholder, suggests that the Board would be motivated to get the best price reasonably available for [the Company's] shareholders."); *Globis P'rs, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at *8 (Del. Ch. Nov. 30, 2007) ("The accelerated vesting of options does not create a conflict of interest because the interests of the shareholders and directors are aligned in obtaining the highest price.").

[115] *Synthes*, 50 A.3d at 1040 ("[W]hen a controlling stockholder acts in accordance with those incentives [to achieve a high price] and shares its control premium evenly with the minority stockholders, courts typically view that as a 'powerfu[l]' indication 'that the price received was fair.'") (quoting *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1143 (Del. Ch.1994), *aff'd*, 663 A.2d 1156 (Del. 1995)).

[116] *See* case cited *supra* note 94.

back early, entirely, and with a 1% prepayment penalty.[117] But, this does not affect the analysis: the Proxy Statement makes clear that at the time the merger was signed, there was no agreement to repay the debt early.[118] Plaintiffs have not alleged otherwise. In addition, even though the Prepayment was anticipated, mere anticipation is not equivalent to having a term in a definitive merger agreement. When the parties signed the Merger, Oaktree was due the same consideration as all other Crimson stockholders and nothing more. Because there was no agreement to repay the debt, the Prepayment could not qualify as additional or different merger consideration. Furthermore, there are no allegations that the Crimson Board was involved in negotiating or approved the debt repayment as part of the Merger Agreement. In fact, the Complaint suggests that Contango approached Oaktree on the subject of the debt, rather than vice versa.[119]

The Court doubts that the 1% prepayment fee would compensate Oaktree sufficiently to cause it to take a lower price for its shares. There are no allegations questioning Crimson's ability to repay the debt; indeed, the Complaint emphasized that Crimson's financial position had been improving in recent years.[120] Oaktree owned some "significant," but unspecified percentage of the Second Lien. Yet, even if it owned the entire Second Lien, which it did not, the value of the prepayment would amount to

---

[117]    Arg. Tr. 30-31 (discussing Contango's refinancing of the debt, as described in its October 1, 2013, 8-K).

[118]    Proxy Statement 111-12.

[119]    Compl. ¶¶ 56, 59.

[120]    *Id.* ¶¶ 101-25.

approximately $1.75 million.[121]   Another $0.12 per share, therefore, would be more

valuable to Oaktree than any amount it *possibly* could have made from the Prepayment

on the terms alleged.[122]   Given the lack of allegations that Crimson was in financial

straits, that Oaktree feared non-payment of its debt, or that the terms of the Second Lien

otherwise were unfavorable to Oaktree, I consider it unreasonable to infer that Oaktree

preferred the Prepayment to a better deal price.  Indeed, one reasonable inference from

the pleadings is that Contango wanted the debt eliminated, preferably by a conversion to

equity—a request Oaktree denied—and therefore repaid it to serve its own interests.

The Proxy Statement notes that Crimson, Contango, and Oaktree all were parties

to the RRA negotiations.[123]   Again, there is no allegation in the Complaint that the

Merger's terms included the RRA.  As such, a similar analysis to the Prepayment could

apply here: the RRA was not part of the actual Merger Agreement and is not alleged to

have been approved by the Crimson Board, so it does not qualify as additional

consideration.  But, Crimson's apparent involvement in the RRA negotiations, while the

merger negotiations were ongoing, suggests that the RRA was more integral to the

Merger Agreement.  Unlike the Prepayment, which appears to have been made in

---

[121]   One percent of the $175 million face value of the Second Lien equals $1.75 million.

[122]   Oaktree's 15.5 million shares multiplied by $0.12 amounts to $1.86 million.  As discussed in Section II.E.1.b below, Plaintiffs allege that the Board undersold the Company by dramatically more than $0.12 per share.  Plaintiffs cannot have it both ways.

[123]   Proxy Statement 60.

Contango's discretion and was not an obligation, Oaktree allegedly "demanded" an RRA from Contango.[124] This is the closest Plaintiffs come to alleging a conflict transaction. Accordingly, the Court must consider whether the RRA conferred a unique benefit on Oaktree.[125]

Plaintiffs answer this question in the affirmative, arguing that the RRA "will allow Oaktree to divest its holdings on more favorable and convenient terms."[126] Plaintiffs also reiterate their theme that Oaktree lacked liquidity or otherwise wished to exit its investment.[127] They emphasize, for example, that Oaktree usually holds its assets for five years, but has held its interest in Crimson for eight.[128] According to Plaintiffs, the mere demand for the RRA showed that "Oaktree apparently wanted out of its Crimson

---

[124]    Compl. ¶ 60.

[125]    There is some dispute whether the RRA gave Oaktree something it did not have already with Crimson, and the parties disputed whether the Court, at this stage, could consider any registration agreement between Oaktree and Crimson. *See* Pls.' Opp'n Br. 30 n.23 (arguing the Court cannot consider any stockholder agreement with Crimson and, regardless, the Merger would extinguish that agreement and the terms of the new one are different and better, so the RRA constitutes a unique benefit). It is unnecessary to resolve these issues. Rather, I will assume the RRA constituted a new benefit for Oaktree.

[126]    Pls.' Opp'n Br. 31-32.

[127]    Arg. Tr. 57 (counsel for plaintiffs likened this case to *infoGROUP*: "in that case, [the court] found that need/desire for liquidity was a different, separate type of consideration . . . the exact same status applies here.").

[128]    Compl. ¶ 16.

investment."[129] The Complaint further asserts that Oaktree's smaller post-transaction holdings allow for easier disposal of its shares.[130]

Based on these rather general and conclusory allegations, I find unconvincing Plaintiffs' contention that Oaktree was motivated by a need for liquidity. In my opinion, it is not reasonably conceivable that Plaintiffs will be able to prove that proposition based on the facts alleged or any reasonable inferences drawn from those allegations. Plaintiffs appear to be arguing that Oaktree's longer-than-normal investment in Crimson reflected the illiquid size of its control block. One previous case, on much more extreme facts, found liquidity to be a compelling motivation in a cash-out merger practically demanded by the controlling stockholder.[131] A later case suggested that for liquidity to be a driving motivation, there would need to be circumstances involving "a crisis, fire sale" of the company.[132] There is no evidence that the Merger challenged in this case represents a crisis, fire sale. Here, Plaintiffs point to the RRA and a longer investment horizon as evidence of a conflict on behalf of Oaktree, but this theory is not reasonably conceivable. First, if Oaktree wished to exit its investment, the obvious method would be a cash-out merger, as in *infoGROUP*, not a stock-for-stock transaction. Second, Oaktree did not propose this transaction or attempt to spring it on the Board, as occurred in *infoGROUP*.

---

[129] *Id.* ¶ 59.

[130] Pls.' Opp'n Br. 30 n.23.

[131] *N.J. Carpenters Pension Fund v. infoGROUP, Inc.*, 2011 WL 4825888 (Del. Ch. Oct. 6, 2011).

[132] *Synthes*, 50 A.3d at 1036.

48

Instead, according to Plaintiffs' own allegations, Keel and Grady began the negotiations with Contango and then contacted Oaktree. These allegations fall far short of the allegations that sufficed to support the possible existence of a conflict in prior cases.[133]

Regardless, I am not persuaded that the RRA, standing alone, conceivably could be a sufficient benefit to require application of the entire fairness standard here. The case law has recognized only a few situations where, despite the stockholders receiving the same consideration, the controller nonetheless receives a unique benefit and the court applies entire fairness: (a) the controller eliminates something bad for it and good for the minority, as in the elimination of the derivative claim in *Primedia*; or (b) all parties suffer a sub-optimal sale price, but the controller still benefits because it receives cash to satisfy an idiosyncratic liquidity problem, as in *infoGROUP*.

The rationale for entire fairness is understandable in both of these instances. *Primedia* can be viewed as a disparate consideration case: By failing to account for the value of the derivative suit—which would have involved a substantial transfer from the controller to the corporation—the controller captured a larger pro rata share of the total consideration. Certain aspects of the *infoGROUP* case could have qualified for enhanced scrutiny under *Revlon*: the board sold the corporation for cash and the allegation was that

---

[133] *See infoGROUP*, 2011 WL 4825888, at *9 (describing controller with $25 million in debt and virtually no incoming cash); *see also McMullin v. Beran*, 765 A.2d 910 (Del. 2000) (describing sale process where 80% controller proposed to sell entire company in cash-out merger, allegedly to satisfy need for cash to fund a separate acquisition, and conducted the negotiations itself, and where the board approved the merger with just one meeting).

49

the board undersold. But, the added conflict on the part of the interested controlling stockholder subjected the transaction to entire fairness.

Here the situation is different. Every stockholder received the same exchange ratio and Oaktree received something that would have had no value to the widely dispersed public stockholder. Oaktree did not face a severe liquidity problem, such as in *infoGROUP*. The RRA appears to have had relatively minimal cash value to Oaktree—basically, lawyers' fees and costs—and no cash value to the minority. The average public stockholder presumably would sell their shares by way of a public market, rather than dispose of them in a private placement; only large blockholders benefit from shelf-registration as provided by the RRA.

Following the Merger, Crimson stockholders owned roughly one-fifth of Contango. Oaktree, through its one-third holdings of Crimson, became about a seven-percent stockholder in the surviving company. That fact alone likely would dramatically increase the liquidity of Oaktree's holdings. The Court finds, therefore, that the RRA, particularly considered in light of Oaktree's lesser holdings following the Merger, is not a sufficiently unique benefit to trigger entire fairness.

Plaintiffs have failed to allege facts sufficient to support a reasonable inference that Oaktree was a controlling stockholder, that it was conflicted in the Contango transaction, or that it received some benefit not shared with the common stockholders. Thus, none of those theories advanced by Plaintiffs provide a basis for applying entire fairness review in this case.

**D.** **The Complaint Does Not Otherwise Allege Facts Sufficient to Rebut the Business Judgment Rule**

Courts also will review a transaction under entire fairness if the plaintiffs allege facts sufficient to rebut the business judgment rule. Plaintiffs can rebut the presumption by showing the board was interested in the challenged transaction or lacked independence. "To successfully rebut the business judgment rule in this manner, thereby leading to the application of the entire fairness standard, a plaintiff must normally plead facts demonstrating 'that a *majority* of the director defendants have a financial interest in the transaction or were dominated by a materially interested director.'"[134]

*Aronson v. Lewis*[135] set forth the now-standard definitions for the terms "interested" and "independent." Interestedness means that the directors "appear on both sides of a transaction [or] expect to derive any personal benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally."[136] "Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences."[137] Establishing a lack of independence requires pleading allegations "that

---

[134] *Orman v. Cullman*, 794 A.2d 5, 22 (Del. Ch. 2002) (quoting *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 979 (Del. Ch. 2000)).

[135] 473 A.2d 805 (Del. 1984).

[136] *Id.* at 812.

[137] *Id.* at 816.

the directors are 'beholden' to the [interested party] or so under [its] influence that their discretion would be sterilized."[138]

Taken as true, the allegations in Plaintiffs' Complaint in this case and the inferences drawn from them are insufficient to create a reasonable doubt that a majority of the Board is disinterested and independent. None of the directors worked for, held stock in, or had any other disqualifying relationship with Contango. At best, Plaintiffs have raised colorable challenges to three board members: Keel, Ford, and McCain. Of those potential challenges, only the allegations of Keel's interestedness have significant traction. Even so, at least four members of the Board—a majority—were independent and disinterested in approving the Merger.

At the outset, the Court rejects Plaintiffs' main allegations that the Crimson Board lacked independence because: (1) Ford, Traub, and Pierce, the Oaktree Directors, worked for the alleged controller; and (2) Keel's longstanding ties to Oaktree aligned him with Oaktree as well. I addressed these arguments at length in Section II.C. Because Oaktree was not conflicted, even if it appointed a majority of the Board, that fact is not relevant to determining the directors' independence or interestedness in this transaction. In that regard, I find persuasive Defendants' argument that: "A rational 33% stockholder and its board representatives would have the same interest as the public stockholders to obtain the highest price reasonably available for Crimson's shares."[139]

---

[138]    *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993).

[139]    Crimson Br. 16.

52

As previously noted, Plaintiffs allege that Keel focused on improving his own post-employment package instead of securing a better exchange ratio. The Complaint, complete with a table, shows Crimson's senior management's post-transaction pay bumps.[140] In addition to securing more lucrative contracts, Keel and company also negotiated extensions of their employment contracts.[141] These deals come on top of standard change-in-control payouts from accelerated vesting of stock options.[142] Even assuming Keel was sufficiently interested in the transaction that his business judgment would be skewed, however, the Complaint is devoid of particularized facts from which I could conclude that Keel dominated the rest of the board on the Merger. This inference founders because everyone had the same self-interest in maximizing the exchange ratio. The benefit to Keel from his anticipated post-transaction employment would need to have been so powerful that it overtook the value he derived from his own shares *and* led him to dominate the Oaktree Directors as well as Ni. The Complaint does not allege facts sufficient to enable the Court reasonably to draw such an inference.[143]

---

[140] Compl. ¶ 70.

[141] *Id.* ¶ 71.

[142] *Id.* ¶ 72.

[143] The available evidence indicates that Keel held significant amounts of Crimson stock and his $150,000 salary increase is dwarfed by the "$1.811 million [he received] as a result of accelerated vesting of restricted stock and deferred exchange payments." *Id.* ¶ 73. In these circumstances, it is more reasonable to infer that Keel would seek to maximize the merger price to increase further the value of his stock options and more than one million shares of common stock.

53

Of the remaining Crimson directors, the only ones that plausibly could be said to be interested are Ford and McCain. Both of these directors would continue as directors post-merger. Even assuming the prospect of a continuing directorship sufficed to make these directors interested, which is doubtful,[144] that would taint only two of Crimson's seven directors. The Complaint, therefore, does not allege sufficient facts to support a reasonable inference that Keel, Ford, or McCain dominated the remaining board members.

In sum, at least four of the seven board members, and perhaps as many as six, were disinterested and independent with regard to the challenged Merger transaction. Because Oaktree was not conflicted in this third-party transaction, there is no basis to impute any Oaktree-based conflict to the Oaktree Directors. Moreover, to the extent that any of the directors held Crimson shares or options, that fact would tend to align their interests with the common stockholders, not create a conflict.[145]

---

[144] *Orman*, 794 A.2d at 28-29 ("No case has been cited to me, and I have found none, in which a director was found to have a financial interest *solely* because he will be a director in the surviving company. To the contrary, our law has held that such an interest is not a disqualifying interest.").

[145] *See Globis P'rs*, 2007 WL 4292024, at *8 ("The accelerated vesting of options does not create a conflict of interest because the interests of the shareholders and directors are aligned in obtaining the highest price."); *In re PNB Hldg. Co. S'holder Litig.*, 2006 WL 2403999, at *10 (Del. Ch. Aug. 18, 2006) ("As a general matter, it is useful to have directors with, as Ross Perot was wont to say, skin in the game. Such directors have a personal interest in ensuring that the company is managed to maximize returns to the stockholders.").

**E.** **The Complaint Fails to State a Claim when Reviewed Under the Business Judgment Rule**

Plaintiffs, through their Complaint, briefing, and oral argument, strenuously attempted to convince the Court to review this merger for entire fairness. So far, they have failed. Oaktree, if it was a controller, was not conflicted in this transaction. And, a majority of the Board was disinterested and independent. As a result, the Crimson Board's decision to enter into the Merger is protected by the business judgment rule unless Plaintiffs have alleged facts from which they conceivably could show bad faith on the part of the Board. Plaintiffs have not met that pleading standard.

### 1. Do Plaintiffs adequately allege bad faith?

### a. The bad faith standard

There is no fiduciary duty of good faith. Instead, good faith is a subsidiary element or condition of the duty of loyalty, as the Delaware Supreme Court stated in *Stone v. Ritter*.[146] As examples of conduct that would establish a failure to act in good faith, the Supreme Court listed the following:

> where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.[147]

---

[146]   911 A.2d 362, 369-70 (Del. 2006).

[147]   *Id.* at 369 (quoting *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006)).

Plaintiffs accuse the Director Defendants of some combination of intentional action not in the best interest of the corporation and a conscious disregard of duties.

Bad faith is not a light pleading standard. Even gross negligence, without more, does not constitute bad faith. When challenging a transaction, it takes an "'extreme set of facts . . . to sustain a disloyalty claim premised on the notion that disinterested directors were intentionally disregarding their duties.'"[148] Allegations that directors failed to do all they should have state merely a violation of the duty of care.

### b. The bad faith allegations

Plaintiffs' bad faith allegations focus on three topics: (a) the merger price; (b) an accounting impairment disclosure; and (c) a conflicted process, particularly as to Barclays. Taking all reasonable inferences in favor of Plaintiffs, I conclude that the allegations in the Complaint are not sufficient conceivably to support a showing of such an "extreme set of facts" as to convert carelessness to disloyalty.

Plaintiffs allege that the consideration was "extraordinarily low"[149] and that the premium for Crimson stockholders was "tiny."[150] There was no need, Plaintiffs argue, to sell Crimson at all and "definitely not at a fire-sale price as was offered by the Merger."[151] The Board made a business judgment to sell the Company. Crimson

---

[148] *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (2009) (quoting *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 654 (Del. Ch. 2008)).

[149] Compl. ¶ 80.

[150] *Id.* ¶ 81.

[151] Pls.' Opp'n Br. 42.

56

retained Barclays to engage in a review of strategic alternatives and they presented six options to the Board, including various recapitalizations that involved continuing as a stand-alone company.[152] Mere disagreement with the Board's ultimate decision to enter into a merger, rather than proceed as a stand-alone company, however, does not show bad faith by the Board members. As to the merger price, Plaintiffs acknowledge that this is not a *Revlon* case. Whether or not Defendants are correct that a stock-for-stock merger not involving a change in control does "not need to reflect a premium *per se*,"[153] Delaware law requires that for an allegation of price inadequacy to support a bad faith claim, the Court would need to conclude that the "price was 'so far beyond the bounds of reasonable judgment that it seems inexplicable on any ground other than bad faith.'"[154] Plaintiffs have failed to allege facts from which this Court reasonably could find or infer that the exchange ratio here, representing a 7.7% premium, satisfies this demanding standard.

There is no rule that a low premium represents a bad deal, much less bad faith.[155] The Complaint alleges, at length, that pre-merger presentations by Keel and Grady at

---

[152]    Proxy Statement 52.

[153]    Crimson Br. 23.

[154]    *In re Alloy, Inc.*, 2011 WL 4863716, at *12 (Del. Ch. Oct. 13, 2011) (quoting *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 981 (Del. Ch. 2000)).

[155]    *See, e.g.*, *In re BJ's Wholesale Club, Inc. S'holder Litig.*, 2013 WL 396202 (Del. Ch. Jan. 31, 2013) (granting motion to dismiss in case with 6.6% premium); *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573 (Del. Ch. 2010) (denying preliminary injunction in case with a 5.5% premium); *In re CompuCom Sys. Inc. S'holder Litig.*, 2005 WL 2481325 (Del. Ch. Sept. 29, 2005) (granting motion to dismiss

various trade shows and investor meetings suggested that Crimson's share value dramatically exceeded the merger price.[156] The Complaint alleges that, throughout 2012 and 2013, "Company management repeatedly told stockholders that it valued the Woodbine asset alone at approximately $5 per share" and that, using net asset value ("NAV"), "Crimson's management had been consistently and continuously providing investors with per share valuations [of] $20 (base case) to $32 (upside case)."[157] This alleged upside case would exceed the merger price by ten-fold.

In this case, Plaintiffs fail to allege that a higher price reasonably was available or that there was another bidder ready and willing to buy Crimson for a higher price. These failures are conspicuous because, if Plaintiffs believed that the Keel and Grady presentations they quoted at length were reliable and accurate, implying the Board approved a sale of the Company for somewhere between one-tenth and one-sixth of its value, one might think some other buyer would emerge to capture this surplus. The merger price emerged as part of a transaction that resulted from nearly four months of negotiations between Crimson and Contango. The Crimson Board approved the Merger after Barclays opined that the price was fair. On the facts alleged, I do not consider it

---

where deal price represented no premium to common stockholders and even a discount to the trading price the day before); *cf. In re Trados Inc. S'holder Litig.*, 73 A.3d 17 (Del. Ch. 2013) (finding transaction where common stockholders received nothing still satisfied the entire fairness standard).

[156] Compl. ¶¶ 86-100.

[157] *Id.* ¶ 86.

reasonably conceivable that Plaintiffs could show that the merger price so exceeded the bounds of reason as to make it explainable only by bad faith.

On a related note, Plaintiffs allege that the Company reported an "apparently unjustified" $117 million impairment in the fourth quarter of 2012.[158] This impairment allegedly is all the more suspicious because the Company's newly appointed Chief Accounting Officer departed the Company shortly after the announcement.[159] Plaintiffs infer from these facts that Crimson's management and Board took "steps to temporarily and artificially suppress the valuation of certain of Crimson's assets in order to conceal the true value of the Company and accomplish the Transaction on terms more favorable and palatable to Contango."[160] Missing from the Complaint, however, are any alleged facts that would support a reasonable inference that Crimson released the disclosure intentionally to drive down the Company's value or that the Board knew or believed the impairment was inaccurate.[161] Instead, the Complaint conclusorily and vaguely states that the "timing and circumstances here suggest that this may well have been an accounting maneuver to seek to artificially and temporarily reduce the overall value of

---

[158]    *Id.* ¶ 127, 136.

[159]    *Id.* ¶ 137.

[160]    *Id.* ¶ 126.

[161]    Plaintiffs allege only the accounting rules behind such impairments "allow for a great deal of discretion," *id.* ¶ 130, and then go on to assert that the admittedly discretionary decision was carried out poorly, *id.* ¶¶ 131-33. Even if the impairment was negligent or grossly negligent, however, more would be needed to show bad faith.

59

the Company so as to help justify the payment of an otherwise unjustifiably low consideration to Crimson stockholders in a pending Contango deal."[162] None of the allegations show or fairly imply that the Director Defendants intentionally acted in a manner other than in the best interests of the Company.

Plaintiffs further allege that Barclays was conflicted and that Barclays's fairness opinion is suspicious. As for the conflicts, a Barclays affiliate acted as the lending agent on the Second Lien and Oaktree hired Barclays to advise it on two significant divestiture deals.[163] Plaintiffs argue that these pre-existing relationships mean that "Barclays was obviously beholden to Oaktree."[164] For this relationship to amount to a conflict, Oaktree would need to have an objective materially different from Crimson and the Company's other stockholders, *i.e.*, a goal other than achieving the highest value for its shares. Plaintiffs' allegations that Oaktree held its investment in Crimson three years longer than usual and sought the RRA do not show a compelling liquidity problem or otherwise make it reasonable to infer that Oaktree sold its shares for less than full value.[165] As discussed in greater detail in preceding sections, Plaintiffs have failed to allege facts that conceivably would support a finding that Oaktree was conflicted in this transaction. The

---

[162]    *Id.* ¶ 136.

[163]    *Id.* ¶ 77.

[164]    Pls.' Opp'n Br. 13.

[165]    *See In re Morton's Rest. Gp., Inc. S'holder Litig.*, 74 A.3d 656, 667-68 (Del. Ch. 2013) (rejecting conclusory argument that private equity fund wished to sell its stake in the company because it typically sold companies every three to five years and had been holding its current investment for over five years).

60

relationship alleged between Oaktree and Barclays similarly fails to support an inference of bad faith on behalf of the Director Defendants.

The Complaint also criticizes Barclays's fairness opinion as flawed and unreliable. The alleged flaws include that: (1) Contango's financial advisor, Petrie Partners Securities, LLC ("Petrie"), consistently valued Crimson higher than Barclays;[166] (2) Barclays chose "unreasonably high discount rates";[167] (3) Barclays failed to include the value of the Buda wells in its fairness opinion;[168] and (4) the Crimson Board "obviously failed" to maintain oversight of Barclays's work.[169]

In many respects, Plaintiffs' allegations boil down to criticisms of Barclays's methodology compared to Petrie's valuation models. To that extent, Plaintiffs' arguments amount to little more than disagreements with Barclays's methods or a belief that another financial advisor would have done a better job. Such allegations do not support a claim of bad faith.[170] Overall, Plaintiffs have failed to allege any flaws so

---

[166]    Compl. ¶ 138.

[167]    *Id.* ¶ 139.

[168]    *Id.* ¶ 122.

[169]    Pls.' Opp'n Br. 45-46.

[170]    Plaintiffs emphasize that Barclays's fairness opinion excluded the Buda wells discovery. According to the Complaint itself, however, the Buda wells announcement by Crimson occurred in late June 2013, almost two months after Barclays issued its fairness opinion. Compl. ¶ 121.

serious that they would negate the Crimson directors' ability to rely, in good faith, on Barclays's professional advice.[171]

Finally, the Complaint's oversight allegations are merely conclusory. Plaintiffs cite Keel and Grady's negotiations with Contango before informing the Board and Barclays's alleged conflicts as examples of the Board's failed oversight. Plaintiffs' rendition of the facts attempts to show that the Crimson Board was asleep at the switch. But, the Crimson Director Defendants, in fact, authorized the exploration of strategic alternatives before any negotiations with Contango began, met numerous times formally and informally to discuss the Merger, and utilized other independent advisors, such as engineering consultants and outside lawyers, to assist them in the process.[172] None of the alleged oversight failures, whether considered separately or collectively, support a reasonable inference that the Director Defendants acted, or failed to act, in bad faith.

Plaintiffs also rather half-heartedly challenge the deal protection measures. They contend that the Merger included "the typical slate of buyer-friendly deal protection mechanism terms."[173] Specifically, the deal included a termination fee, a no-solicitation

---

[171] *See Selectica, Inc. v. Versata Enters., Inc.*, 2010 WL 703062, at *17 (Del. Ch. Feb. 26, 2010) ("Under [8 *Del. C.*] § 141(e), where a board has relied on an expert's advice in making a decision, a due care claim challenging that decision must establish such facts as would make reliance on the expert opinion unreasonable."), *aff'd*, 5 A.3d 586 (Del. 2010).

[172] *See* Proxy Statement 50-63 (detailing the history of the Merger). Plaintiffs obviously are aware of these facts. *See* Pls.' Opp'n Br. 45-46 (citing Proxy Statement 50-54 as support for their assertion that Keel and Grady conducted negotiations before informing the Board).

[173] Pls.' Opp'n Br. 15.

agreement, and matching rights for Contango, as described in Section I.D.4 *supra*. The termination fee represented about 4.49% of Crimson's equity value, which is at the high end of the range of fees the courts have found reasonable.[174] The no-solicitation provision, with a fiduciary out, allowed the Crimson Board to consider superior proposals subject to Contango's temporally limited matching rights.[175] These deal protection terms, particularly the termination fee, were negotiated at length[176] and the package of protections suggests that the parties' focus was on deal closure. As noted, Plaintiffs do not seriously contest these measures. In any event, I do not find it reasonably conceivable that Plaintiffs could show the Director Defendants acted in bad faith by approving these deal protection measures.

Finally, Plaintiffs allege that Crimson locked up the Merger with binding support agreements. Oaktree and other Crimson executives and Board members entered into support agreements assuring that at least 37.25% of the vote would favor the deal.[177]

---

[174] *See, e.g.*, *In re Answers Corp. S'holder Litig.*, 2011 WL 1366780, at *4 n.47 (Del. Ch. Apr. 11, 2011) (denying motion for preliminary injunction for merger involving a termination fee of 4.4% of equity value); *Dollar Thrifty S'holder Litig.*, 14 A.3d at 613-14 (upholding termination fee of 3.9% of equity value); *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975 (Del. Ch. June 24, 2005) (upholding termination fee of 3.75% of equity value combined with matching rights).

[175] Proxy Statement 120-21.

[176] *Id.* at 56-59.

[177] Compl. ¶ 64. The Proxy Statement counted the support agreements and Oaktree as totaling roughly 38.3% of Crimson's outstanding shares. Proxy Statement 130. The Court will assume the higher number.

First, as Plaintiffs note, the support agreements allowed for termination if the Board changed its recommendation and Contango's stockholders voted against the Merger or if Crimson received an unsolicited superior proposal.[178] Second, Plaintiffs failed to plead facts sufficient to support a reasonable inference that a majority of the vote was locked up.

Plaintiffs argue that Ni's vote was "assured" because he "had already expressed his support for the Merger by voting in favor of the Merger Agreement" as a director.[179] There may be situations where the Court, in the absence of a formal support agreement, reasonably could infer that a majority of the shares were locked up and the merger was a foregone conclusion. Plaintiffs have not alleged such facts here. A director's vote in favor of a merger is not equivalent to a lock up and does not have the same force as a stockholder entering into a binding voting agreement. Most importantly, there is no evidence that Ni, as a Crimson director or as an officer or agent of ACEC, entered into a contractual commitment to vote the shares he controlled in favor of the deal. In total, therefore, over 60 percent of the vote remained in play. Thus, the vote was not a foregone conclusion.

In sum, Plaintiffs have failed to plead facts from which this Court conceivably could conclude that the Director Defendants acted in bad faith.

---

[178]    Compl. ¶ 64.

[179]    Pls.' Opp'n Br. 41.

### 2. The remaining duty of care claims cannot overcome the exculpatory provision in Crimson's Certificate of Incorporation

The Crimson Certificate of Incorporation includes an exculpatory provision, as permitted by 8 *Del. C.* § 102(b)(7), which exculpates the Board of Directors for violations of the duty of care. As such, to adequately state a claim for monetary damages, the Complaint must plead a breach of the duty of loyalty, such as by alleging bad faith by the directors. At this point, the Complaint seeks only damages. The Complaint failed adequately to allege a conflicted transaction by a controller or a majority of the Board or that the Board members acted in bad faith. Thus, Plaintiffs have not stated a claim for breach of the duty of loyalty. Any remaining duty of care claims, therefore, fail to state a claim under Crimson's exculpatory provision.

Plaintiffs also purport to have pled claims based on disclosure flaws in the Proxy Statement. In two paragraphs in the 160-paragraph Complaint, in the course of criticizing Barclays, Plaintiffs allege that the Proxy Statement failed to disclose: (1) certain details about how Barclays calculated the exchange ratio in its NAV analysis; and (2) the details of how Barclays inadvertently understated Crimson's projected 2017 cash flows.[180] To the extent these allegations represent more nit-picking as to Barclays's methodology, I dismiss them for the reasons stated in the preceding section.

To the extent Plaintiffs assert that Defendants violated their disclosure obligations, they have waived these arguments. Plaintiffs did not mention any of these alleged

---

[180]  Compl. ¶¶ 139, 141.

disclosure problems in their Opposition Brief or at the Argument.[181]  As such, any

disclosure claims are waived.[182]  Even if the arguments are not waived, they fail to state a

claim under Rule 12(b)(6).  As for the inadvertent understatement of future cash flows,

the Proxy Statement mentioned the understatement.  Nevertheless, Plaintiffs ask for more

details.  With regard to the NAV analysis, Plaintiffs seek inclusion of specific details

about how Barclays conducted its analysis.  Proxy Statements, however, need not

disclose every detail underlying a financial advisor's analysis.[183]  Thus, assuming

Plaintiffs are pursuing a disclosure claim, they have failed to allege that anything material

was omitted from the Proxy Statement.[184]  Furthermore, and in any event, the allegations

---

[181]   *See* Arg. Tr. 33-34 (counsel for Defendants: noting this point).

[182]   *See Emerald P'rs v. Berlin*, 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2003) ("It is settled Delaware law that a party waives an argument by not including it in its brief.").

[183]   *See In re 3Com S'holder Litig.*, 2009 WL 5173804, at *6 (Del. Ch. Dec. 18, 2009) ("There are limitless opportunities for disagreement on the appropriate valuation methodologies to employ, as well as the appropriate inputs to deploy within those methodologies. Considering this reality, quibbles with a financial advisor's work simply cannot be the basis of a disclosure claim."); *Globis P'rs, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at *11 (Del. Ch. Nov. 30, 2007) (describing disclosures required for work done by investment bankers).

[184]   *See Wayne Cty. Empls. Ret. Sys. v. Corti*, 2009 WL 2219260, at *8 (Del. Ch. July 24, 2009) (to establish a material omission from a proxy statement, "a plaintiff 'must show a substantial likelihood that the omitted facts would have assumed actual significance in the deliberations of a reasonable stockholder because, if disclosed, those facts would have significantly altered the total mix of information available to stockholders'") (quoting *Wayne Cty. Empls. Ret. Sys. v. Corti*, 954 A.2d 319, 330 (Del. Ch. 2008)) (internal quotations omitted).

66

here would support, at most, a duty of care violation, which would be barred by the exculpatory provision.[185]

### 3. Plaintiffs' claim for aiding and abetting also fails

The preceding sections showed the Complaint failed to state a claim against Oaktree or the Director Defendants for breaching any fiduciary duty. Plaintiffs accuse Contango and the Merger Sub of having aided and abetted such purported breaches of fiduciary duty. Because the underlying breaches of fiduciary duty are being dismissed, Plaintiffs' aiding and abetting claim must be dismissed as well.[186] The only possible exception would be as to an otherwise exculpated claim for breach of the duty of care. If Contango or the Merger Sub aided or abetted such a breach, they could be liable because they do not come within the exculpation clause.

Even assuming a breach of the duty of care by the Director Defendants, however, the Complaint does not adequately plead aiding and abetting by Contango or the Merger Sub. Stating a claim for aiding and abetting requires allegations meeting each part of a four-pronged test: (1) the existence of a fiduciary relationship; (2) a breach of that fiduciary's duty; (3) Defendants' knowing participation in that breach; and (4)

---

[185] *Globis P'rs*, 2007 WL 4292024, at *15 ("There is nothing in the Complaint, however, from which the Court reasonably could infer any of the alleged breaches was anything other than a good faith, erroneous judgment as to the proper scope of disclosure. Thus, Section 102(b)(7) provides an alternative basis for dismissing [Plaintiffs'] claims the Individual Defendants breached their fiduciary duty of disclosure.").

[186] *Id.* ("As this Court has determined that the Complaint fails to state a claim for any underlying breach of fiduciary duty, [Contango and the Merger Sub] cannot be liable for aiding and abetting such a breach.").

damages.[187] Here, the Complaint fails to allege knowing participation by Contango or the Merger Sub in any breach of fiduciary duties by Defendants.

In their Opposition Brief, Plaintiffs argue that Contango exploited the divergent interests among Crimson insiders, such as Oaktree and Keel. Plaintiffs specifically point to the fact that Contango met with Oaktree in an effort to negotiate the RRA.[188] Accordingly, Plaintiffs ask the Court to infer that Contango knowingly participated in breaches of fiduciary duties by Oaktree and the Board. This Memorandum Opinion rejects the argument that Oaktree breached any fiduciary duties it may have owed as a controller in this Merger. As such, the allegations as to Oaktree cannot form the basis of an aiding and abetting claim. Aside from these arguments—which appear directed to duty of loyalty violations, which were dismissed on the merits *supra*—the Complaint is devoid of any non-conclusory statements from which I reasonably could infer that Contango or the Merger Sub aided or abetted any non-dismissed breaches of fiduciary duties. Thus, Plaintiffs' aiding and abetting claims also will be dismissed.

### F.    The Motion to Intervene

At the Argument, the Court stayed Fisichella's motion to intervene pending a decision on the motions to dismiss.[189] Having concluded for the reasons stated in this Memorandum Opinion that Plaintiffs' Complaint fails to state a claim and should be

---

[187]    *Mapiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).

[188]    Pls.' Opp'n Br. 47 (citing Compl. ¶¶ 59-60).

[189]    Arg. Tr. 7-10.

dismissed under Rule 12(b)(6), and having received full briefing on the motion to intervene, I turn next to that motion.

Resolving the motion to intervene involves two questions. First, whether the Court should permit Fisichella to intervene based on the requirements for intervention in Court of Chancery Rule 24. And, second, whether there is something sufficiently compelling about the motion to intervene that the Court, under Court of Chancery Rule 15(aaa), should dismiss this action with prejudice as to the existing Plaintiffs only and allow Fisichella to amend the Complaint or file a new complaint to include the information he obtained from his books and records action under 8 *Del. C.* § 220 (the "220 Information").[190] As discussed below, these two questions significantly overlap.

Rule 24 allows two types of intervention: intervention of right and permissive intervention. Fisichella seeks to enter this case as a permissive intervenor. A party seeking permissive intervention must show that their "claim or defense and the main action have a question of law or fact in common."[191] Applications for permissive intervention are subject to the Court's discretion. "In exercising its discretion the Court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties."[192] Fisichella's motion satisfies the commonality

---

190      Fisichella, in connection with his memorandum in support of his motion to intervene, filed a proposed Verified Class Action Complaint in Intervention. Intervenor's Mem. Ex. 1.

191      Ct. Ch. R. 24(b).

192      *Id.*

requirement in that he asserts the same breach of fiduciary duty claims in connection with the Merger. As such, the main considerations are the issues of undue delay and prejudice to the adjudication of the rights of Defendants.

Rule 15(aaa), a procedural rule with no federal analog, provides that parties responding to a motion to dismiss under Rule 12(b)(6) have the option of amending their complaint or filing a responsive brief to the motion to dismiss. If the parties file a responsive brief and the "Court thereafter concludes that the complaint should be dismissed under Rule 12(b)(6) . . . such dismissal shall be with prejudice . . . unless the Court, for good cause shown, shall find that dismissal with prejudice would not be just under all the circumstances."[193] At the Argument, Plaintiffs chose to go forward with their opposition to Defendants' motions to dismiss on their existing Complaint, notwithstanding Fisichella's then-pending and briefed motion to intervene. As a result, the dismissal of this Complaint is, by default, with prejudice as to Plaintiffs.

The wrinkle is the pending motion to intervene. Fisichella seeks to intervene under Rule 24(b). The parties do not seriously dispute that he meets the basic requirements for permissive intervention, but Defendants urge the Court to exercise its discretion to deny intervention here. To resolve this dispute, I must consider: (1) whether Fisichella, as an intervenor, brings something so compelling to the table that the Court should consider dismissing the Complaint with prejudice only as to the existing Plaintiffs rather than the class as a whole, including Fisichella; and (2) whether the timing of the

---

[193]     Ct. Ch. R. 15(aaa).

70

motion to intervene is such that granting it would unduly delay or prejudice the adjudication of the rights of Defendants.

Defendants primarily argue that the motion to intervene is untimely. Fisichella filed the 220 action on May 8, 2013, and apparently received at least some responsive documents by the end of June.[194] He filed suit in Texas in late July, and the Texas court stayed that action on August 30, 2013, pending resolution of the Crimson litigation in this forum.[195] Fisichella did not move to intervene here until January 28, 2014, nearly five months after the Texas court stayed his action and the day after the parties completed briefing on Defendants' motions to dismiss.[196]

While ordinarily delay such as Fisichella's would cause serious concern, it is less of a problem in the circumstances here. As Fisichella expressly stated in his Intervenor's Reply Brief, he "does not seek to take over this litigation, to replace Co-Lead Plaintiffs or Co-Lead Counsel, or to litigate a 'duplicative parallel litigation.'"[197] Fisichella further asserted that his "sole purpose" in seeking to intervene in this action "is to place the 220

---

[194]   Intervenor's Mem. 3-4.

[195]   *Id.* at 7-9. By the time Fisichella filed his complaint in Texas, all nine of the actions that comprise this consolidated Delaware Action already had been filed.

[196]   Defendants moved to dismiss this action on October 14, 2013. Plaintiffs filed their Opposition Brief on December 27, nearly four months after the Texas court stayed Fisichella's suit. To the extent Plaintiffs wanted to add any of the 220 Information, they could have done so before filing their Opposition Brief. Similarly, Fisichella could have moved to intervene well before December 27. Yet, he waited an additional month, until the day after Defendants filed their Reply Brief, to seek to intervene.

[197]   Intervenor's Reply 1.

Information, which the Delaware Plaintiffs were unable to secure, before the Court to aid in its consideration of the pending motions to dismiss."[198] Without these disclaimers, the Court might be facing the prospect of allowing the filing of a new complaint, followed by a new motion to dismiss, and another round of briefing and argument. That would be disruptive, wasteful of the resources of the Court and the litigants, and prejudicial to Defendants. Because Defendants and Fisichella essentially have invited the Court to consider the 220 Information in deciding the pending motions to dismiss, however, the potential for such prejudice is greatly reduced. Therefore, I have accepted that invitation and taken the new information proffered by Fisichella into account in analyzing Defendants' motions.

Fisichella argues that the information from the 220 action is highly relevant to this case.[199] In reviewing Fisichella's arguments and the expanded allegations in his proposed complaint, however, I find nothing that would lead me to reach a different conclusion on the motions to dismiss.

Fisichella argues that the new information shows Oaktree had inside information about the Merger and that its representatives often formed a majority of the directors in attendance at the relevant Board meetings. Assuming those allegations are true, that

---

[198] *Id.*

[199] The Court also notes that Plaintiffs declined to take a position on Fisichella's intervention. Moreover, Defendants stated in their Brief Opposing Intervention that "Defendants have agreed to allow Lead Plaintiffs to make use of the [220 Information] in connection with the motions to dismiss." Defs.' Opp'n to Intervention 3. Nevertheless, Plaintiffs chose not to do so.

would support an inference that Oaktree was a controller as to the Merger. In this Memorandum Opinion, however, I have found that even if Oaktree did control Crimson, Oaktree was not conflicted in the transaction such that the entire fairness standard would apply. Fisichella also contends that the new information shows the inadequacy of the merger price. I rejected all of Plaintiffs' similar arguments about inadequate price, however, and I saw nothing in the additional information Fisichella seeks to introduce that would cause me to alter that conclusion. Further, Fisichella relies on the 220 Information to attack Barclays's valuations and submits that, in any event, Barclays's work shows that the merger consideration was inadequate. At most, the 220 Information indicates that the premium paid for Crimson was below average. But, as discussed previously, a low premium does not mean that the Board acted in bad faith in approving the Merger. Finally, although Fisichella alleges a series of process-related flaws, the more important of these were addressed either directly in the Complaint or in Plaintiffs' briefing. I conclude, therefore, that Fisichella's information only would add greater detail to arguments the Court already has rejected, without materially strengthening those arguments.

For these reasons, I hold that dismissing the Complaint with prejudice to the class would not be unjust. Furthermore, based on the marginal benefit of the 220 Information and my determination that consideration of the 220 Information would not enable Plaintiffs or Fisichella to avoid dismissal under Rule 12(b)(6), I conclude that the motion to intervene should be denied.

### III. CONCLUSION

For the reasons stated in this Memorandum Opinion, Defendants' motions to dismiss are granted, and Plaintiffs' Complaint is dismissed with prejudice. In addition, I deny Fisichella's motion to intervene.

**IT IS SO ORDERED.**